Coy E. BAILEY, Jr., Defendant Below, Appellant,

v.

STATE of Delaware, Plaintiff Below, Appellee.

Supreme Court of Delaware.

Submitted Oct. 20, 1981.

Decided Jan. 20, 1982.

Joseph A. Hurley (argued), Paul, Lukoff & Hurley, Wilmington, for appellant.

James E. Liguori (argued), Deputy Atty. Gen., Dover, for appellee.

Before HERRMANN, C. J., and DUFFY and McNEILLY, JJ.

McNEILLY, Justice:

Defendant, Coy Bailey, Jr., was found guilty by a Superior Court jury of Murder in the First Degree and sentenced by the Court to life imprisonment without benefit of probation or parole. He appeals on numerous grounds; however, we find it necessary to address only three of defendant's contentions: 1) that the search warrant for defendant's premises and automobile was not based upon probable cause; 2) that certain statements which defendant allegedly made at the time of his arrest, after having been given his *Miranda* warnings, were nevertheless improperly admitted into evidence because he did not understand his constitutional rights; and 3) that the prosecution employed improper, unprofessional and prejudicial trial tactics in reserving the bulk of its concluding comments for the rebuttal. We reverse and remand the case for a new trial.

I

The defendant was convicted of the intentional killing of Frank Dukes, whom defendant allegedly gunned down at a makeshift shooting range. Present with the defendant at the scene of the shooting was the State's chief witness, Michael Sponaugle. According to Sponaugle, he, the defendant, and the victim were engaged in shooting empty glass bottles off a log behind the residence of Sponaugle's parents. Sponaugle asserts that as the victim was setting up additional bottles on the log, defendant aimed a .44 revolver at him and fired it, striking the victim. After some discussion between Sponaugle and the defendant as to how to dispose of the body,

Sponaugle claims that he returned to his parents' house to make sure his parents had not observed the shooting. At that time, he claims to have heard a second shot emanating from the shooting scene.

Sponaugle's testimony is hotly disputed by defendant who contends that it was Sponaugle who shot the victim and then shot him again in the back of the head as he lay wounded near the log. Similarly, there is disagreement as to what transpired after the shooting. Sponaugle claims that he went to his parents' house and telephoned Corporal Tarailia of the Delaware State Police at his home to inform him that defendant had just killed Frank Dukes. Sponaugle related that he then went to defendant's house where defendant gave him a gasoline can and instructed him to buy gas for the purpose of burning the victim's body. Instead of buying the gas, Sponaugle stated that he proceeded to the police station to meet Corporal Tarailia. From the police station, Sponaugle and other police officers drove to Sponaugle's house. Defendant telephoned Sponaugle at his home asking about the gasoline, and Sponaugle suggested that defendant come over to pick it up. When defendant came over, he was thrown to the ground and handcuffed by police.

Defendant disputes this version of the events following the shooting. Defendant testified that after he returned to his house he received a telephone call from Sponaugle's father indicating that Sponaugle would be over to obtain the gasoline can which defendant had borrowed earlier. Sponaugle arrived at defendant's house and went behind it to a burning bin area where he allegedly began to burn some of the victim's personal papers. Defendant stated that Sponaugle had concealed the murder weapon in a brown paper bag under his shirt and that Sponaugle expressed a desire to clean the weapon. Defendant stated further that Sponaugle cleaned the gun and left it on a buffet in defendant's house. Sponaugle then left the house to get the gasoline. Defendant assumed that Sponaugle had put the gun back in his shirt when he left. Defendant also acknowledged that

he called Sponaugle later to find out whether he had purchased the gasoline and that he drove over to Sponaugle's house where he was arrested.

A search warrant was obtained for the defendant's home, property and motor vehicles and was executed on the evening of defendant's arrest. The police found a .44 revolver with live rounds and spent casings in a brown paper bag underneath a chair cushion in defendant's living room.

## II

In support of his claim that the affidavit accompanying the search warrant did not supply the probable cause necessary for the issuance of the warrant, defendant asserts that Michael Sponaugle was a police informant whose prior reliability had never been verified. Defendant concludes that Sponaugle's status as a police informant precludes the conferral of "citizen informant" status upon him, which status does not require proof of prior reliability.

██ We disagree. A prior basis for establishing the reliability of an informant is unnecessary in the case of an average law abiding citizen performing a civic duty by reporting a crime. Indeed, a citizen informant "is a passive observer with no connection with the underworld, and no reason to fabricate what he has seen or heard, and as such is considered presumptively reliable." *Hooks v. State*, Del.Supr., 416 A.2d 189, 202 (1980). See *Wilson v. State*, Del.Supr., 314 A.2d 905, 907–08 (1973); *Warren v. State*, Md.App., 29 Md.App. 560, 350 A.2d 173, 180 (1976).

██ Sponaugle falls into the category of "citizen informant." The record shows that he was not a member of the criminal community, but rather an individual who occasionally telephoned police to report minor incidents of which he had knowledge. Sponaugle's information about the shooting and its aftermath provided the probable cause to support the issuance of the search warrant.

Defendant concedes that an informant's tip can be corroborated externally. *Garner v. State*, Del.Supr., 314 A.2d 908 (1973). Such is the case here. After Sponaugle told Officer Collison of the occurrence and location of the shooting, the police officer confirmed the information by finding the victim's body at the location described by Sponaugle. Sponaugle further named defendant as the murderer, described the type of gun used and related that defendant left the Sponaugle residence with the gun to return home. When defendant later returned to the Sponaugle residence without the gun, Officer Collison reasonably concluded that the murder weapon could be located by a search of defendant's property. The affidavit, which recited all these facts, provided the probable cause required for the issuance of the search warrant and was, therefore, constitutionally sufficient. Del. Const. Art. I, § 6.

### III

■ We also disagree with defendant's contention that statements which he uttered immediately following his arrest were improperly admitted at trial because he did not understand his constitutional rights and did not waive those rights. At his arrest, defendant was informed that he was being charged with First Degree Murder and was given his *Miranda* warnings orally. Five minutes later, the police read the *Miranda* warnings to him again. Defendant was asked whether he understood his rights, but he did not respond directly to the question. Instead, he asked to speak with an agent of the Bureau of Alcohol, Tobacco and Firearms. When the police moved defendant from the garage in which he was arrested, defendant struck up a conversation with Sponaugle within earshot of Officer Collison. In that exchange, defendant admitted that he owned the .44 revolver and that he had left it at the scene of the shooting. Officer Collison overheard this conversation and interrupted it to inquire further about

the murder weapon. Defendant stated that he had obtained the gun from an individual in Wilmington, that he had shot the gun that morning at Sponaugle's house, and that he had left it on Sponaugle's truck.

The circumstances here point to an awareness by defendant of his constitutional rights and a valid waiver of those rights. Defendant did not indicate, after having been apprised twice of his constitutional rights, that he wished to remain silent or speak to an attorney. Instead, he initiated a conversation with a private citizen and continued it with a police officer. These circumstances reflect a voluntary, knowing and intelligent waiver of defendant's constitutional rights. See *Edwards v. Arizona*, 450 U.S. 477, 101 S.Ct. 1880, 1883–84, 68 L.Ed.2d 378 (1981); *Fare v. Michael C.*, 442 U.S. 707, 724–25, 99 S.Ct. 2560, 2571–2572, 61 L.Ed.2d 197 (1979); *North Carolina v. Butler*, 441 U.S. 369, 374–75, 99 S.Ct. 1755, 1757–1758, 60 L.Ed.2d 286 (1979); *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938).

### IV

We now turn to defendant's third argument. At the conclusion of the witnesses' testimony, the State prosecutor delivered his opening summation to the jury. The opening summation was very brief, constituting a mere 3½ pages of the transcript and lasting only 5 minutes. The gist of the prosecutor's terse opening remarks was that, based upon the evidence, the State had proved that the defendant had intentionally killed Frank Dukes. With the exception of a passing reference to one of the witnesses, the State prosecutor did not comment on the testimony of any of the witnesses or on the circumstances surrounding defendant's arrest. At this juncture, after the State had completed its opening summation, an unreported sidebar conference was held.[1] It is not disputed that in that conference, defendant's lawyer lodged an

---

1. The absence of a complete record of all pertinent exchanges between a Trial Court and counsel is particularly distressing in a case of this magnitude and is not unlikely to constitute reversible error in a foreseeable situation. See *State v. White*, Del.Supr., 395 A.2d 1082, 1095 (1978).

objection to the State's trial strategy of making introductory remarks in the opening summation and using the closing summation, not as a rebuttal, but as a vehicle to carry the thrust of its case to the jury. While the record shows that the Trial Judge admonished the State prosecutor about the propriety of such tactics, the record is devoid of any ruling in the matter. To the contrary, as we will later set forth more fully in this opinion, the Trial Judge permitted the prosecutor to proceed with his contemplated strategy in spite of the prior defense objection and the Court's admonition.

In his summation, defense counsel focused on the testimony and actions of Michael Sponaugle, who was present at the shooting scene, and argued that it was Sponaugle who was responsible for the murder. The defense counsel also addressed, sometimes very briefly, the testimony of certain witnesses but did not comment on the testimony given by other witnesses. Defense counsel similarly did not discuss statements allegedly made by defendant at the time of his arrest or events appurtenant to his arrest and did not deal with the removal of the victim's body from the murder site.

Toward the conclusion of his summation, the defendant's attorney complained that the prosecutor's tactic of reserving the bulk of his closing comments for the rebuttal (characterized by the defense as "sandbagging") precluded defense counsel from responding to the State's arguments.[2]

The State's rebuttal lasted over an hour and contained the bulk of the State's final argument to the jury. The prosecution utilized the rebuttal to discuss the testimony of numerous witnesses whose testimony was not mentioned by the defense in its summation or by the State itself in its opening summation. The prosecution dwelled at length on the question of how the victim's body was removed from the murder scene. Likewise, considerable time was devoted to the statements of defendant and the actions of various police officers at the time of defendant's arrest. The State also responded to the defense counsel's earlier criticism of the prosecution's "sandbagging" tactic, stating:

> Now, you heard Mr. Hurley talking about trial tactics and he said I sandbagged him right now. Well, the fact of the matter is he and I played enough golf to know that I'm not sandbagging. This is just a trial tactic. This is the way to do it. When he was here I'm sure he would have done the same thing, but let me tell you a little something else about trial tactics.

In a conference in the Trial Judge's chambers following the respective summations, defense counsel moved for a mistrial based, *inter alia*, upon the State prosecutor's "sandbagging" strategy. The defense attorney reminded the Court of the defendant's objection to such tactics, which was made at the earlier unreported side bar conference, and of the Court's admonition that the State prosecutor confine the scope of his rebuttal to matters raised in defense counsel's closing summation.[3] The Trial Judge denied the motion.

---

**2.** Defense counsel stated:

> The last few things that I would tell you are things that I leave you with, the most important things, and I would point out something that I think is—you know, I constantly avoided criticizing the State, because there was no need to. This is a criticism. There are two ways to handle this now. I only get one chance to talk to you and it would be my anticipation that Mr. Liguori would have gone—told you what he had to tell you about his case, his theories, and let me have a chance to respond to it to you, but he didn't tell you the whole thing. Well, he's going to get up here now and he's going to be able to—what we call sandbag in the business—let me have it, and I can't say a word. And I may have fifty good arguments for anything he says, but he knows I've got to sit there. I can't stand up and I can't say a word. So, ladies and gentlemen, just realize when he's doing it this way—and, you know, it's nothing personal, but it's a tactic. When he's doing it this way, just realize I would like to be up giving some arguments to you. I can't do it. He didn't want me to have the opportunity to rebut, I suggest to you, because there will be holes in it. If you will look closely enough, you'll see the holes.

**3.** Defense counsel stated:

■ The general rule governing the argument of a case to a jury is a simple one:

[C]ounsel having the affirmative (usually the plaintiff) should develop in his opening statement the points and matters which he wishes to present. The defendant may answer such argument and develop all the points he considers of importance. Then the plaintiff in closing may reply to and counter any argument the defendant has made. The closing argument should be in the nature of a rebuttal. The plaintiff should not conceal or "sandbag" by wholly omitting from argument a salient point or feature of the case and then (if it is not argued by defendant . . .) make a closing argument on that feature.

*Misch v. C. B. Contracting Co.*, Mo.App., 394 S.W.2d 98, 102 (1965).

At the time we approached side bar in court, after Mr. Liguori's opening remarks, I made two applications. One was for a mistrial, based upon Mr. Liguori's indicating his personal belief in his case. Your Honor at that time admonished him, refused to grant the mistrial and told him that he's not—it's not proper for him to give his personal belief.

* * * * * *

Secondly, while we were at side bar I indicated to the Court that Mr. Liguori had spoken—had begun his summation at ten-o-nine. His direct summation concluded at ten-fourteen, obviously five minutes. I then indicated that I thought it was violative of the Sixth Amendment right to a fair trial for the State simply to get up and make some general remarks and then to reserve its entire thrust of his case for the defense after the defense has made its statement without giving the defense the opportunity to rejoin.

Your Honor indicated, as I understood it, that it was proper, but admonished the State that it could only comment on things brought out to rebut what I had said.

I specifically did not mention anything about the circumstances of the arrest, injuries to the defendant, statements that he made at the time of his arrest, because I assumed that the State would be foreclosed from doing that, based upon your Honor's representations.

Mr. Liguori went on at length indicating comments about Nazi storm trooper tactics at the time of the arrest. I hadn't even mentioned that. Mr. Liguori said that Heverin, Collison and Bundek would have to be involved—and I'm paraphrasing using the words—in a conspiracy in order to deny the defendant his rights. I never talked about anything like that.

For a time, courts were adamant in confining the scope of a plaintiff's rebuttal strictly to a response to points raised in defense counsel's closing summation. See *Shaw v. Terminal R.R. Ass'n*, Mo.Supr., 344 S.W.2d 32 (1961); *Johnson v. State*, Wis.Supr., 192 Wis. 22, 211 N.W. 668 (1927). The rule is rooted in the concepts of due process and fundamental fairness. Simply put, it is unfair and often highly prejudicial for plaintiff's or State's counsel to avoid treatment of certain issues in the opening summation so as to deprive defense counsel of the opportunity to reply. *Misch*, supra, at 103; *Southern Kan. Ry. Co. v. Michaels*, Kan. Supr., 49 Kan. 388, 30 P. 408, 410 (1892). Although it is the preferable and customary practice for plaintiff's counsel to limit rebuttal to those issues raised in defense counsel's summation, "this principle is honored more in its breach than in its observ-

Mr. Liguori talked about statements made by the defendant at the time of his arrest, about his memory lapses, about his shooting with Sponaugle, about the guy running through the woods and about buying the forty-four. I didn't mention any of that, and that was not fair rebuttal.

Mr. Liguori went on about Billie Rae and her actions, talking about killing Frank Dukes, as Mr. Liguori said. I never said anything about that.

Mr. Liguori said Barbara Stewart and the phone calls—phone call that afternoon and about the incident three weeks before. I never mentioned any of that.

Mr. Liguori referred to signatures on the ammunition list and the guns and gun list. I never mentioned any of that.

I think all of this is not fair rebuttal. I think the effect of this is Mr. Liguori has lain in wait, waited for me to commit myself, and he's gone far beyond anything that I've said. He has again directly—inadvertently perhaps, but directly ignored the Court's admonishment, and it is not fair rebuttal. What he has done—the last thing I would point to as an improper comment is Mr. Liguori, during the course of his conversation, said words to the effect that the worst thing that my client had done was not to commit the murder, but was to have affected his son or put his son up to lying or whatever, and who knows what effect that's going to have on the boy. That's totally improper argument and appeals to an element that is not supposed to be part and parcel of this. This is totally prejudicial.

ance." *Chandler v. Miles*, Del.Supr., 193 A. 576, 580 (1937). Typically, the breach occurs where plaintiff's counsel makes only introductory or perfunctory remarks in his opening summation and utilizes his rebuttal for the "argument in chief."

The general rule has evolved to give trial courts a modicum of discretion to allow a more substantial rebuttal which is not so narrowly tailored to the scope of defense counsel's summation. See *State v. Rosa*, Conn.Supr., 170 Conn. 417, 365 A.2d 1135, *cert. denied*, 429 U.S. 845, 97 S.Ct. 126, 50 L.Ed.2d 116 (1976); *United States v. Lawson*, 483 F.2d 535 (8th Cir. 1973); *Moore v. United States*, 344 F.2d 558 (D.C.Cir.1965); *Marks v. State*, Wis.Supr., 63 Wis.2d 769, 218 N.W.2d 328 (1974); *State v. Peterson*, Mo.Supr., 423 S.W.2d 825 (1968); *State v. Hale*, Mo.Supr., 371 S.W.2d 249 (1963); *Goldstein v. Fendelman*, Mo.Supr. 336 S.W.2d 661 (1960); *Votrain*, supra; *Reddell v. Norton*, Ark.Supr., 225 Ark. 643, 285 S.W.2d 328 (1955); *Chandler*, supra. In *Peterson*, supra, the Court held that the issue of abuse of discretion

> will, of course, be ruled in each case on its own peculiar facts, including these issues: whether a fair statement of the State's position has been made in some manner in its opening argument; whether any waiver has been made by the defendant, either by his counsel's own argument or by the failure to object properly and to preserve the point; and, lastly, a determination of the question of prejudice in view of all the circumstances.

*Id.* at 831.

Some courts have deemed the tactic of "sandbagging" to be reversible error only if defense counsel objects to the incompleteness of plaintiff's opening summation, *Lawson*, supra; *Shaw*, supra; *Goldstein*, supra; Contra *Republic Ins. Co. v. Dickson*, Tex. Civ.App., 110 S.W.2d 642 (1937); *Bender v. Mattler*, Tex.Civ.App., 17 S.W.2d 182 (1929), or requests a surrebuttal. *Hubbard v. Matlock*, Ariz.App., 24 Ariz.App. 554, 540 P.2d 173 (1975).

## VI

■ Application of these authorities to the facts at hand compels us to reverse and remand this case for a new trial on the ground that the Trial Court abused its discretion in permitting the State to utilize the inherently prejudicial "sandbagging" trial strategy. The transcript of the respective summations plainly indicates that the State ignored the Trial Judge's admonition against using the sandbagging approach and far exceeded the scope of its rebuttal by delving into matter purposely left untouched by defense counsel in his summation. The prosecution referred to the testimony of numerous witnesses which was not addressed by the defense because of the obvious prejudicial effect upon the defense and raised questions about the manner in which the victim's body was moved from the shooting scene. The State prosecutor also made reference to statements given by the defendant and actions of the state police at defendant's arrest. Because of the brevity of the State's opening summation, defense counsel was left to guess which issues the State would discuss in its rebuttal.

While the authorities we have cited invest the Trial Court with a measure of discretion as to the application of the rule governing the scope of a rebuttal, that discretion is not so broad as to permit a Trial Judge to oversee a blow to a defendant's right to a fair trial via the State's sandbagging. "Closing argument is 'an aspect of a fair trial which is implicit in the Due Process Clause of the Fourteenth Amendment by which the States are bound.'" *Hooks*, supra, at 205, *quoting Donnelly v. DeChristoforo*, 416 U.S. 637, 649, 94 S.Ct. 1868, 1874, 40 L.Ed.2d 431 (1967) (Douglas, J., dissenting). It is encumbent upon the Trial Judge to protect the defendant's right to a fair trial through constant vigilance over the conduct of all officers of the Court, even without an objection thereto. *Washam v. State*, Del.Supr., 235 A.2d 279, 280 (1967). We caution against any abdication of this important responsibility.[4]

---

4. We are disturbed by the Trial Judge's apparent belief, evident from the transcript, that the

In the instant case, defense counsel inveighed against the State's rebuttal strategy on three different occasions: 1) at an unreported side bar conference; 2) during his closing summation; and 3) at a conference in the Trial Judge's chambers. It is indisputably an abuse of discretion for the Trial Judge to deny a motion for mistrial where, as here, defense counsel raises a valid objection to the State's prejudicial sandbagging. *Lawson*, supra; *Shaw*, supra; *Goldstein*, supra. To reiterate our firm belief: "[C]ounsel should not conceal or withhold his position. He should play the cards dealt him face up and in his rightful turn. He has no right to sneak an ace out of the discards and play it later." *Misch*, supra, at 103.

\*   \*   \*

REVERSED and REMANDED.

---

closing arguments of counsel have no impression on a jury. In serious and close cases, such as this, where an accused faces a possible death sentence, the summations and rebuttal are extremely influential. *Commonwealth v. Guess*, Pa.Supr., 266 Pa.Super. 359, 404 A.2d 1330, 1333 (1979). It is critical, therefore, that the defendant not suffer the prejudice that necessarily ensues from a derogation of the rule limiting the content of a rebuttal.