Ronnie L. HALL, Appellant,

v.

UNITED STATES, Appellee.

No. 84–792.

District of Columbia Court of Appeals.

Argued Feb. 13, 1987.

Decided March 21, 1988.

Barbara R. Miller, Washington, D.C., appointed by this Court, for appellant.

Barry Coburn, Asst. U.S. Atty., with whom Joseph E. diGenova, U.S. Atty. at the time the brief was filed, and Michael W. Farrell and J. Michael Hannon, Jr., Asst. U.S. Attys., Washington, D.C., were on the brief, for appellee.

Before FERREN, BELSON and TERRY, Associate Judges.

TERRY, Associate Judge:

Appellant was convicted on three counts of armed robbery, in violation of D.C.Code §§ 22–2901 (1981) and 22–3202 (1987 Supp.). He contends on appeal that the government violated Super.Ct.Crim.R. 12.1, which requires reciprocal disclosure by the defense and the prosecution of information relating to the defendant's alibi. He further maintains that the trial court erred in permitting the prosecutor to elicit "other crimes" evidence during cross-examination and that the prosecutor's rebuttal summation to the jury exceeded the scope of defense counsel's summation. We find no reversible error and affirm all three convictions.

I

At about 6:30 p.m. on Saturday, October 22, 1983, Anthony Burnette, Randolph Scott, and Michael Moore were on their way to a school playground, where they intended to smoke some marijuana and drink beer. As they walked along a footpath in a park that led toward the playground, they were startled by three young men who came out of the bushes. One of the three—appellant Ronnie Hall—came up to Scott and asked for a light. While Burnette and Moore went on ahead, Scott stopped and reached in his pocket for a match. As he did so, Hall pulled out a silver handgun and placed it against Scott's head, saying, "You know what this is; you've seen it on TV." At the same time, one of Hall's companions stopped Anthony Burnette, and Burnette recognized him as "Aaron," someone he had previously met through his childhood friend Ronnie Hall. Hall then approached Moore, who had been walking ahead of the others, pointed a gun in his face, and told him to walk back to where Scott and Burnette were standing.

Burnette immediately recognized Hall, who was standing very close to him, because they had been classmates in both junior high and high school. They had seen each other almost every day, and their relationship, according to Burnette, had been "real close." Burnette also knew Hall's address. At trial, however, Burnette testified that during the robbery he was afraid to mention that he recognized Hall for fear of being shot.

While standing in front of Moore and holding a gun to his nose, Hall reached into Moore's pockets and removed $10.00. He then told Moore to sit on the ground, and one of Hall's companions ordered Moore to hand over his ski jacket and watch. Hall meanwhile walked over to Scott and took from him a black corduroy jacket and $4.00 or $5.00 in cash. Then Hall put the gun to Scott's head, cocked it, and demanded that Scott hand over more money. When Scott insisted that he had none (although in fact he had $30.00 hidden in a secret fold in his wallet), Hall told Scott to sit down, removed the gold and silver chains from around Scott's neck, and took Scott's bag of marijuana.

Burnette was searched by the third robber, who nervously went through Burnette's pockets and took two packs of cigarettes, $10.00 in cash, a watch, and two bags of marijuana. The robbers also took the beer that the three young men had just purchased. Then they fled across a field toward Galveston Street, in the direction of some apartment buildings, instructing their victims to run in the opposite direction. Burnette and Scott ran only a few steps and then stopped. Burnette informed his two friends that he had recognized one of the robbers and that he wanted to look for him. The three of them made an attempt to find the robbers in the area of the nearby apartment buildings, but after a few minutes they realized they were having no luck, so they abandoned their search and went to report the incident to the police. Burnette told the police that he had grown up with one of the robbers and gave them Hall's full name and address, as well as the first name of the second robber, Aaron. Each of the victims provided the police with descriptions of their assailants.

Five days later the victims were shown an array of nine photographs, which included one picture of Ronnie Hall. Each of

them identified Hall as one of the robbers. A few months thereafter, at a witness conference in the prosecutor's office, Detective Renager Lee of the Metropolitan Police showed each of the three victims photographs of two lineups, and each victim in turn identified Hall from the first photograph.[1] The second photograph was of a different lineup in which Aaron Roberts (but not Hall) appeared; Burnette—who had recognized Hall's friend "Aaron" as the second robber—was the only one of the three to identify Roberts from this picture. Some time later Burnette pointed out to Detective Lee the house where Hall lived, which was across the alley from where Aaron Roberts lived.[2]

At trial Hall called three alibi witnesses to testify on his behalf: Angela Hall, his sister; June Hall, his mother; and Stephanie Adams, his girl friend. Angela Hall stated that her brother had driven her at 1:00 p.m. to a rehearsal of the young adult choir of the Little Rock Bible Way Church, which rehearsed on the fourth Saturday of every month. After the rehearsal ended, Angela Hall testified, Ronnie Hall drove her and Stephanie Adams to the Hall home, arriving shortly after 4:00 o'clock. The three of them watched television for about three hours and then ate dinner with Hall's parents. Angela said that some time later, after the dishes had been washed, her brother came into her room with Stephanie Adams and said that he was going to drive Stephanie home; however, Angela did not actually see them leave the house.

June Hall, the mother of Angela and Ronnie Hall, corroborated Angela's testimony. So did Stephanie Adams, who testified that in October of 1983 she was in the process of joining the choir at the Little Rock Bible Way Church, although she had not actively participated in any of its rehearsals.[3]

Ronnie Hall's testimony was consistent with that of his mother, sister, and girl friend. He said that he was at his home with them from late afternoon until about 10:30 or 11:00 p.m., when he drove Stephanie Adams home. He also admitted that he knew Anthony Burnette and that he was a friend of Aaron Roberts. On cross-examination Hall testified that, although he normally worked evenings at Swensen's Ice Cream Parlor in Georgetown, he did not work on the evening of October 22.

The government then called three witnesses in rebuttal. Shirl Coley, the secretary of the choir at the Little Rock Bible Way Church, testified that her duties included keeping the lists on which the names of all the choir members were recorded. She stated that Stephanie Adams' name was not on any of her lists and that Adams had never been a member of the choir. In addition, Coley said that the regular rehearsals took place on the third Saturday of each month, which contradicted Angela Hall's testimony that they were on the fourth Saturday. There was a rehearsal on October 22, Coley testified, but it was a special one, in which the choir obtained new robes and practiced some new songs in celebration of its anniversary. This testimony rebutted both Angela Hall's and Stephanie Adams' testimony that the rehearsal on that day was not at all unusual.

Gwendolyn Steward, who had been the president of the choir in October of 1983, described certain unusual events that occurred at the October 22 rehearsal. She also testified that she did not see Stephanie Adams at the rehearsal that day and that Adams was not a choir member.

The last rebuttal witness was Randy Hooks, appellant Hall's cousin, who was also the night shift manager at Swensen's. He identified Hall's time card and testified that the card showed that Hall had

---

**1.** Both the array of nine individual photographs and the two lineup photographs were shown separately to each of the three victims.

**2.** Roberts and Hall were jointly indicted for the robbery of Burnett, Scott, and Moore. Hall was tried separately from Roberts, however; the record does not reveal the disposition of Roberts' case.

**3.** Adams said, however, that the choir practiced on the third Saturday of every month, not the fourth Saturday. In 1983 October 22 was the fourth Saturday of the month.

punched in for work at 8:58 p.m. on October 22.

## II

Hall maintains that his convictions must be reversed because the government violated Super.Ct.Crim.R. 12.1, which requires both sides to disclose in a timely manner certain information concerning alibi and "anti-alibi" witnesses.[4] Hall contends that strict adherence to the time limitations in the rule is mandatory in order to avoid surprise and to enable the parties to plan trial strategy. He asserts that the government did not make its alibi demand until eleven days before the trial began, and that this demand violated Rule 12.1 because it did not allow sufficient time before trial for a complete exchange of information in accordance with the rule. He seeks reversal on the ground that the government waited until "the eleventh hour"—the very morning of trial—to disclose the names and addresses of its three rebuttal witnesses, Shirl Coley, Gwendolyn Steward, and Randy Hooks, whose testimony was offered to rebut Hall's alibi. We hold that the trial court properly exercised its broad discretion in allowing the testimony of these three witnesses to be heard by the jury.

Hall's trial began on March 28, 1984. On March 16 the case was assigned to a new prosecutor because the one to whom it had originally been assigned had a scheduling conflict.[5] The next day, March 17, after reviewing the case, the new prosecutor filed and served on defense counsel a Rule 12.1 demand for the names and addresses of his alibi witnesses and other information covered by the rule. At the same time, because he knew the trial date was imminent, he also served on defense counsel a list of his own anti-alibi witnesses. When the prosecutor learned on March 19 that defense counsel had not yet received the list of witnesses in the mail, he gave defense counsel the names and addresses of his own witnesses over the telephone.

The names of Coley, Steward, and Hooks, however, were not on the prosecutor's list. He did not learn until the evening of March 27, the day before trial, that Coley and Steward might be able to provide useful testimony, and it was not until early afternoon on March 28 that he learned about Hooks. He immediately told defense counsel about these additional witnesses

**4.** Rule 12.1 provides in part:

(a) *Notice by defendant.* Upon written demand of the prosecutor stating the time, date, and place at which the alleged offense was committed, the defendant shall serve within ten days, or at such different time as the Court may direct, upon the prosecutor a written notice of his intention to offer a defense of alibi. Such notice by the defendant shall state the specific place or places at which the defendant claims to have been at the time of the alleged offense and the names and addresses of the [witnesses] upon whom he intends to rely to establish such alibi.

(b) *Disclosure of information and witness.* Within ten days thereafter, but in no event less than ten days before trial, unless the Court otherwise directs, the prosecutor shall serve upon the defendant or his attorney a written notice stating the names and addresses of the witnesses upon whom the government intends to rely to establish the defendant's presence at the scene of the alleged offense and any other witnesses to be relied on to rebut testimony of any of the defendant's alibi witnesses.

(c) *Continuing duty to disclose.* If prior to or during trial, a party learns of an additional witness whose identity, if known, should have been included in the information furnished under paragraph (a) or (b), the party shall promptly notify the other party or his attorney of the existence and identity of such additional witness.

(d) *Failure to comply.* Upon the failure of either party to comply with the requirements of this Rule, the Court may exclude the testimony of any undisclosed witness offered by such party as to the defendant's absence from, or presence at, the scene of the alleged offense. This rule shall not limit the right of the defendant to testify in his own behalf. Because this rule is substantially identical to Fed.R.Crim.P. 12.1, we may look to federal court decisions interpreting the federal rule as "persuasive authority" in interpreting the local rule. *Vale Properties, Ltd. v. Canterbury Tales, Inc.,* 431 A.2d 11, 13 n. 3 (D.C.1981) (citing cases).

**5.** Our summary of the pertinent events is based on the prosecutor's representations to the trial court on the third day of trial, just before the government began to present its rebuttal evidence. The prosecutor's account of what happened has not been contested either in the trial court or in this court, and we accept it as true, as the trial court did.

and said that he intended to call them in rebuttal. Defense counsel objected to the admission of their testimony, but the court overruled his objection.

To prevail on this appeal, Hall must demonstrate to our satisfaction that the trial court abused its discretion in permitting Coley, Steward, and Hooks to testify. *United States v. Burkhalter*, 735 F.2d 1327, 1329 (11th Cir.1984); [6] *United States v. Portillo*, 633 F.2d 1313, 1324 (9th Cir. 1980), *cert. denied*, 450 U.S. 1043, 101 S.Ct. 1763, 68 L.Ed.2d 241 (1981). Because Rule 12.1 "builds in considerable discretion on the part of the trial judge," *United States v. Hutton*, 558 F.2d 1265, 1266 (6th Cir.), *cert. denied*, 434 U.S. 970, 98 S.Ct. 519, 54 L.Ed.2d 459 (1977),[7] we find no abuse of discretion in this case.

■ We conclude, first of all, that there was no violation by the prosecutor of Rule 12.1(a) or (b). The only time limit imposed on the prosecutor by either of these portions of the rule is the provision in Rule 12.1(b) that he serve on the defense a list of his own anti-alibi witnesses at least ten days before trial. That requirement was met here; the list was served on March 17, and trial did not begin until March 28, eleven days later. Commendably, the prosecutor followed through with a telephone call on March 19 to make sure that defense counsel had received his list. When he found out that it had not yet arrived, he gave him the names of the witnesses over the phone. Commendably also, defense counsel in the same conversation provided the prosecutor with the names of his alibi witnesses and the gist of his alibi defense.

Such free and open exchange of information between opposing counsel is consistent with the spirit of Rule 12.1 (and Rule 16 as well) and should be strongly encouraged by the courts.

■ We further conclude that this case is governed by Rule 12.1(c), which states that "[i]f prior to or during trial, a party learns of an additional witness whose identity, if known, should have been included in the information [previously given] ... the party shall promptly notify the other party or his attorney of the existence and identity of such additional witness." The prosecutor here informed defense counsel of the identities of his three rebuttal witnesses as soon as he learned of them himself. We are satisfied that he complied with Rule 12.1(c) and that he took every possible precaution to avoid prejudice at trial. *See Lewis v. United States*, 771 F.2d 454, 456 (10th Cir.), *cert. denied*, 474 U.S. 1024, 106 S.Ct. 579, 88 L.Ed.2d 562 (1985). "[I]t is clear that the government did not intentionally withhold from [defense counsel] the identit[ies]" of its rebuttal witnesses. *United States v. Burkhalter, supra*, 735 F.2d at 1329. Furthermore, the record discloses no real prejudice to the defense. The government's evidence was strong, especially the testimony of Burnette that he had been friends with Hall since junior high school and knew exactly where he lived. The jury decided, as it was entitled to do, that this evidence was more credible than Hall's alibi.

Paragraph (d) of Rule 12.1 gives the trial court broad discretion to admit or exclude

---

**6.** *Burkhalter* was a pre-trial appeal by the government under 18 U.S.C. § 3731 (1982) from an order suppressing the testimony of two witnesses. Although it was "not a Rule 12.1 case," 735 F.2d at 1329, the court nevertheless applied Rule 12.1 criteria in reviewing the trial court's order. Quoting from an earlier decision, it listed "five factors that the district court should consider" in ruling on claims of government failure to comply with Rule 12.1:

(1) the amount of prejudice that resulted from the failure to disclose,
(2) the reason for nondisclosure,
(3) the extent to which the harm caused by nondisclosure was mitigated by subsequent events,

(4) the weight of the properly admitted evidence supporting the defendant's guilt, and
(5) other relevant factors arising out of the circumstances of the case.

*Id., citing United States v. Creamer*, 721 F.2d 342, 344 (11th Cir.1983).

**7.** Specifically, paragraph (d) of Rule 12.1 states that upon the failure of either party to comply with the requirements of the rule, the court "may exclude the testimony of any undisclosed witness...." Paragraph (e) further provides that "[f]or good cause shown, the court may grant an exception to any of the requirements of paragraphs (a) through (d) of this Rule."

the testimony of any witness whose identity has not been disclosed in accordance with paragraphs (a), (b), or (c). In this case we conclude that there was no violation by the government of paragraphs (a), (b), or (c). But even if there was, we find no abuse of discretion under paragraph (d).

## III

On direct examination defense counsel asked Hall about his two prior convictions [8] and his status as a recent parolee. Later on cross-examination the prosecutor questioned Hall again about these matters for impeachment purposes, which of course was quite proper. *See Beale v. United States*, 465 A.2d 796, 800 (D.C.1983), *cert. denied*, 465 U.S. 1030, 104 S.Ct. 1293, 79 L.Ed.2d 694 (1984); *Kitt v. United States*, 379 A.2d 973, 975 (D.C.1977). In particular, the prosecutor asked him about his obligation to maintain employment while on parole. Hall stated that at the time of his arrest in this case he had been working on a construction project for approximately two months. The prosecutor then showed him a Pretrial Services Agency report so that he could refresh his recollection as to the amount of time he had been a construction worker. After examining the report, Hall acknowledged that the report said he had worked for only three weeks.[9] Hall now contends that these questions went beyond mere impeachment and introduced substantial "other crimes" evidence in order to show that he had a criminal disposition. *See generally Drew v. United States*, 118 U.S.App.D.C. 11, 16, 331 F.2d 85, 90 (1964). We see no merit in this argument.

In the circumstances presented here, the fact that Hall was on probation or parole did not amount to "other crimes" evidence. *See, e.g., Ford v. United States*, 396 A.2d 191, 193–194 (D.C.1978). The prosecutor's questions and Hall's answers on cross-examination merely reminded the jury that Hall had been previously convicted of a crime, which defense counsel had already revealed on direct examination; the purpose of the reminder was only to impeach Hall's credibility as a witness.[10] The prosecutor's cross-examination, therefore, was not subject to the procedural requirements of *Day v. United States*, 360 A.2d 483, 485 n. 5 (D.C.1976), or the substantive limitations mandated in *Drew v. United States, supra,* and its myriad progeny. We find no error.

## IV

Finally, Hall contends that the prosecutor's rebuttal argument improperly exceeded the scope of defense counsel's closing argument. Specifically, he maintains that the prosecutor "sandbagged" defense counsel by postponing a full discussion of the alibi testimony until rebuttal. We hold that the trial court did not abuse its discretion in allowing the prosecutor to argue as he did.

During his initial summation the prosecutor spent most of his time recalling the testimony of the three victims and the investigating police detective. However, he did touch briefly upon the alibi evidence by referring at one point to Hall's time card from Swensen's, which showed that he went to work on the evening of the robbery, contrary to Hall's testimony that he was at home all evening with his family and his girl friend. Defense counsel then gave a short closing argument (just six and

---

**8.** Hall had previously been convicted of voluntary manslaughter and unauthorized use of a vehicle. For these offenses he had been placed on parole and probation, respectively, which required him to abide by certain conditions, including an obligation to report any new arrest to his parole officer. Hall testified that he had reported his arrest in this case to his parole officer.

**9.** Hall contends that statements made to the Pretrial Services Agency are privileged and confidential and therefore could not be used by the prosecutor to impeach him. This argument lacks merit because D.C.Code § 23–1303(d) (1981) specifically permits information from agency reports to be used "for the purposes of impeachment in any subsequent proceeding."

**10.** The trial court twice gave limiting instructions that "the defendant's prior criminal convictions are admitted into evidence solely for ... consideration in evaluating the credibility of the defendant as a witness."

a half pages of transcript), which contained only a brief mention of his client's alibi:

> There may be some of you who have heard the testimony who may accept the alibi of Mr. Hall, may accept part of it, or may reject it completely. But just remember, those of you who may reject the alibi defense completely, you still have to be convinced beyond a reasonable doubt that the government has made [its] case against Mr. Hall.

In his rebuttal argument, the prosecutor began his discussion of Hall's alibi by remarking that defense counsel "didn't say much about that in his closing argument...." He then reviewed in detail the testimony of all the alibi witnesses, as well as the government's anti-alibi witnesses who testified in rebuttal. When defense counsel objected that the prosecutor was exceeding the proper scope of rebuttal, the court overruled the objection. Hall's contention here is that the trial court abused its discretion in failing to restrict the prosecutor to a specific rebuttal of the arguments made by defense counsel in his closing argument.

■ Both parties agree that a trial court is vested with broad discretion in controlling the scope of closing argument by either counsel. *Peoples v. United States,* 329 A.2d 446, 449 (D.C.1974). Improper prosecutorial comments are looked upon with special disfavor when they appear in the rebuttal argument because at that point defense counsel has no opportunity to contest or clarify what the prosecutor has said. *See, e.g., Powell v. United States,* 455 A.2d 405, 411 (D.C.1982).

"As a general rule, Government counsel should not be allowed to develop new arguments on rebuttal, but should be restricted to answering the arguments put forth by defense counsel." *Moore v. United States,* 120 U.S.App.D.C. 173, 175, 344 F.2d 558, 560 (1965); *see Misch v. C.B. Contracting Co.,* 394 S.W.2d 98, 102 (Mo.App.1965). This general rule, however, is not as ironclad as appellant contends; rather, it "has evolved to give trial courts a modicum of discretion to allow a more substantial rebuttal which is not so narrowly tailored to

the scope of defense counsel's summation." *Bailey v. State,* 440 A.2d 997, 1003 (Del. 1982) (citations omitted); *accord, e.g., State v. Rosa,* 170 Conn. 417, 428, 365 A.2d 1135, 1142 ("There is no rigid requirement that a prosecutor's final summation must be limited solely to rebuttal of matters raised in the defendant's argument"), *cert. denied,* 429 U.S. 845, 97 S.Ct. 126, 50 L.Ed.2d 116 (1976).

Hall places great reliance on *Bailey v. State, supra,* in which the prosecutor delivered only a five-minute opening summation, reserving the bulk of his arguments for rebuttal, which went on for more than an hour. In reversing the conviction, the Delaware Supreme Court held that the trial judge had abused his discretion in permitting the prosecutor to make "only introductory or perfunctory remarks in his opening summation and [utilize] his rebuttal for the 'argument in chief.'" 440 A.2d at 1003.

> [C]ounsel ... should play the cards dealt him face up and in his rightful turn. He has no right to sneak an ace out of the discards and play it later.

*Misch, supra,* 394 S.W.2d at 103, quoted in *Bailey, supra,* 440 A.2d at 1004. At the same time, however, the *Bailey* court reiterated the principle that a trial judge has broad discretion in determining how farranging a rebuttal argument may be, and that reversal depends on the degree of prejudice in light of all the circumstances.

■ Applying that principle to the instant case, we conclude that reversal is not required. In the first place, what happened in this case was not comparable to what happened in *Bailey.* The prosecutor's initial summation here, unlike that in *Bailey,* was extensive and thorough, discussing in detail the testimony of several witnesses. Furthermore, the primary purpose of the rule announced in *Moore* is to protect defense counsel from surprise, and in this case there was nothing in the prosecutor's rebuttal that could reasonably have surprised defense counsel. The prosecutor made no new arguments, but focused his (and the jury's) attention on the evidence that the defense itself had presented. Finally, and crucially, when defense counsel

argued—however weakly—that Hall's alibi was worthy of the jury's acceptance, he opened the door for the prosecutor's response. *See Barrett v. Morris*, 495 S.W.2d 100, 104–105 (Mo.App.1973). Had defense counsel said nothing at all about the alibi, this would be a different case, but on the record before us we find no basis for reversal.[11]

*Affirmed.*

---

11. Hall argues that the trial court, in overruling his objection to the prosecutor's rebuttal argument, applied an erroneous legal standard. We need not decide this point. Even if we assume that the court erred, the error was harmless because, as we have held, the prosecutor's rebuttal did not exceed permissible limits.