796 S.E.2d 174

The STATE, Respondent,

v.

Walker Manning HUGHES, Appellant.

**Appellate Case No. 2014-000294**
**Opinion No. 5465**

Court of Appeals of South Carolina.

Heard September 21, 2016
Filed January 18, 2017

Chief Appellate Defender Robert Michael Dudek, of Columbia, for Appellant.

Attorney General Alan McCrory Wilson, Chief Deputy Attorney General John W. McIntosh, Senior Assistant Deputy Attorney General Donald J. Zelenka, and Assistant Attorney General Caroline M. Scrantom, all of Columbia; and Solicitor William Walter Wilkins, III, of Greenville, for Respondent.

MCDONALD, J.:

Walker Manning Hughes appeals his convictions for murder, first-degree burglary, grand larceny, and possession of a weapon during the commission of a violent crime, arguing the circuit court erred in (1) admitting prejudicial hearsay testimony and (2) denying his motion to require the State to open fully on the law and the facts during closing arguments. We affirm.

**FACTS/PROCEDURAL HISTORY**

Hughes's mother, Karen Hughes (Victim), was the beneficiary of two trusts which were to be divided between Hughes and his brother, Larry Hughes, upon her death. Two days before Victim's murder, Hughes was released from the Greenville County Detention Center after pleading guilty to forging checks written on Victim's trust account. Hughes received a probationary sentence and was ordered to have no contact with Victim.

Victim's coworker, Kim Jones, testified that on Friday, April 8, 2011, Victim left work early to meet a repairman and reapply for a restraining order against Hughes. Victim was last seen alive by a neighbor that afternoon. At that time, Victim was wearing a brown track suit. Neighbors reported the lights at Victim's home were off that Friday night and remained off throughout the weekend. On Monday, April 11, neighbor Max Few went to Victim's house after learning from Jones that Victim had not arrived at work. Few called police after noticing Victim's car was gone, Victim's dog was uncharacteristically locked on the back porch, and the screen door to

the porch had been cut. Police forced entry onto the property by cutting a padlock off the front gate and breaking through the front door, which had been secured by a deadbolt.

Inside, police discovered Victim's badly beaten body [1] surrounded by bloody footprints.[2] Police also discovered a bloody knife on the kitchen counter, as well as a washed claw hammer and brush in the washing machine.[3] In Victim's bedroom, police found the contents of her purse spread out on the bed and several drawers that had been opened and stacked on the floor.[4] Sergeant Chris Miller of the Greenville County Sheriff's Office testified the crime appeared to be personal because neither jewelry nor electronics were taken and many of the rooms were undisturbed. The only items missing from the home were Victim's car, her car keys, and a garage door opener.

On the evening of April 11, police found Hughes in Victim's car at a gas station in Laurens County. When police searched the car, they discovered the missing car keys and Victim's garage door opener in the driver's side door pocket. Additionally, they found Hughes's blood around the driver's seat as well as on a pair of Conair electric clippers and their box. Police found a small cut on one of Hughes's index fingers.

DNA testing at Victim's home revealed that a swab of blood taken from the upstairs bedroom closet and a swab of blood from the living room contained Victim's blood mixed with that of someone else. Specifically, the State's forensic DNA analyst, Brian Browning, testified the bedroom closet swab contained a mixture of three individuals, with Victim as a major contributor and two minor trace alleles identified with Hughes and an unknown individual. Browning explained that alleles are "individual pieces of a DNA profile" and cautioned that he was "not speaking about a [complete] profile." Browning further ex-

---

1. Victim was wearing a brown sweat shirt and sweat pants.

2. The medical examiner opined Victim died of blunt force trauma to the head and believed there were at least eleven separate impacts.

3. Visible brush marks suggested an attempt was made to clean some blood off of a door. Additionally, fabric imprints in some of the blood stains suggested Victim's killer wore gloves.

4. Police also noted Victim's bedroom door had its own deadbolt.

plained that the unknown contributor could be the result of instrument limitations in detecting individual pieces of a DNA profile or "the possible masking of certain alleles due to a mixture sample where several contributors can overlap each other." On cross-examination, Browning clarified that minor trace alleles were detected and "they included some of the alleles of Walker Manning Hughes as well as [an] unknown individual."

Concerning the living room swab, Browning testified Victim was a major contributor to the sample and there was also a minor male contributor. He opined there was "a high probability of it being a mother/son mixture" and was able to exclude Hughes's brother as a donor. Conversely, the expert stated he could not exclude Hughes and the probability of including someone at random as a minor contributor was one in two hundred forty-one among the Caucasian population. Michael Isakson, who knew Hughes from their time at the Greenville County Detention Center, testified Hughes was angry that Victim had obtained a restraining order against him and that Hughes offered him $70,000 to beat Victim to death. Isakson stated that when he declined the offer, Hughes indicated he would have to do it himself. According to Isakson, Hughes further claimed that, despite the restraining order, he planned to go to Victim's house when he was released to "collect some money and stuff."

Sheryl Slavensky, Hughes's friend and past romantic interest, testified that sometime in 2009 or 2010, she had a conversation with Hughes, during which he was furious and blamed Victim for his parents' divorce. According to Slavensky, Hughes stated he wanted to kill Victim and "bash her head in." He said he "wanted it to be slow and he wanted to be able to watch her face." Slavensky testified she informed Victim of the threat.

Hughes took the stand in his own defense. He testified that when he was released from jail on April 6, he walked to Victim's house, where he arrived at dusk on April 8. He then waited until Victim returned from walking her dog and spoke with her outside the home until she invited him inside. According to Hughes, he told Victim he had a young daughter whom Victim did not know about. When Hughes revealed the child's

mother had doubts about the child's paternity, Victim instructed him to go get the child. Hughes claimed Victim then gave him $140 and escorted him to the garage, where she allowed him to take her car. Hughes stated Victim also gave him a Conair haircut kit, some candy, and packages of t-shirts and underwear.

Hughes then testified about his efforts in the following days to find the child's mother. When someone reported that the child's mother worked at a nearby Walmart, he traveled to several area stores to locate her. Hughes claimed that while parked at the Simpsonville Walmart, he cut his finger on a broken meth pipe and had to stop the bleeding with items in the car. After further travels, Hughes eventually ran out of gas at the Laurens County gas station where he was apprehended. According to Hughes, he thought Victim had reported the car stolen and he "choked up" when an investigator told him she had been murdered.

## LAW/ANALYSIS

### I. Hearsay Testimony

█ Hughes argues any testimony concerning the reasons Victim feared him was inadmissible hearsay and highly prejudicial. Specifically, Hughes challenges testimony by Margo Green, Ben Leaphart, Few, and Marion Beachum. We find that even if some portion of this "fear" testimony was inadmissible, Hughes has failed to demonstrate the prejudice necessary to establish reversible error.

Before trial, the State indicated it planned to introduce evidence that Victim feared Hughes. The State relied on *State v. Weston*, 367 S.C. 279, 625 S.E.2d 641 (2006), and argued the fear testimony was relevant to the issue of whether Victim would have given Hughes permission to use her car. The trial court's preliminary ruling was that *Weston* was "very much on point" and Rule 803(3), SCRE, would permit such testimony.

Green, Victim's longtime friend, testified that on April 8, Victim stated she was upset because Hughes had been released without her knowledge and she would have to "be especially careful now that he was back out on the street." On cross-examination, Green admitted that in a February 2011 email, Victim indicated Hughes's incarceration was "bittersweet" but that she had slept better since he was in jail. On

redirect, Green stated Victim was "always afraid" and "on guard" when Hughes was not in jail and would lock herself in her bedroom with a deadbolt at night.

Leaphart, Victim's estate attorney, testified Victim indicated she was uncomfortable around Hughes, had some verbal confrontations with him, and was concerned about his "drug use and his lifestyle."

Few testified that on the day before the murder, Victim asked him to "watch out" for her because Hughes was out of jail and she feared Hughes would "come in and kill her." Few described Victim as frustrated and "very scared" during the conversation.

Beachum, Victim's trust officer, testified Victim indicated she was "deathly afraid" of Hughes and feared that if he ever got her alone, he would kill her. Beachum noted that Victim never expressed that level of fear toward her estranged husband or Hughes's brother.

 "In criminal cases, the appellate court sits to review errors of law only." *State v. Washington*, 379 S.C. 120, 123, 665 S.E.2d 602, 604 (2008). "A ruling on the admissibility of evidence is within the sound discretion of the trial court and will not be reversed absent an abuse of discretion." *Id.* at 123–24, 665 S.E.2d at 604. "The improper admission of hearsay is reversible error only when the admission causes prejudice." *Weston*, 367 S.C. at 288, 625 S.E.2d at 646.

" 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Rule 801, SCRE. Rule 803(3), SCRE, provides that a statement "of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed" is not excluded by the hearsay rule. Our supreme court has held that "while the present state of the declarant's mind is admissible as an exception to hearsay, the reason for the declarant's state of mind is not." *State v. Garcia*, 334 S.C. 71, 76, 512 S.E.2d 507, 509 (1999). The court cautioned that "[i]f the reservation in the text of the rule is to have any effect, it must be understood to narrowly limit those admissible state-

ments to declarations of condition—'I'm scared'—and not belief—'I'm scared because [someone] threatened me.'" *Id.* (quoting *United States v. Cohen*, 631 F.2d 1223, 1225 (5th Cir. 1980)).

In *Garcia*, appellant claimed the fatal shooting of his girlfriend was an accident. *Id.* at 73, 512 S.E.2d at 508. The victim's grandmother testified that on the day before the shooting, the victim indicated she had a bruise on her leg because appellant kicked her. *Id.* The victim's cousin testified that a week before the shooting, the victim stated appellant threatened to kill her if she ever left him. *Id.* at 74, 512 S.E.2d at 508. Our supreme court held the testimony was improperly admitted under Rule 803 stating, "While their testimony presents circumstantial evidence of the decedent's fear of appellant and concern for her safety, the testimony improperly reveals the reason for her state of mind (i.e., that appellant had kicked and threatened to kill her)." *Id.* at 76, 512 S.E.2d at 509.

*Weston* involved a defendant accused of moving in with his elderly mother and then killing her. 367 S.C. at 282–84, 625 S.E.2d at 643–44. One witness testified the victim's demeanor changed from cheerful to unhappy and miserable once the defendant moved in with her. *Id.* at 285–86, 625 S.E.2d at 644–45. Another witness stated that in the weeks before the crime, the victim became anxious and nervous and asked that no one touch anything in the defendant's room because she was afraid. *Id.* at 286, 625 S.E.2d at 645. The supreme court held the witnesses' statements were properly admitted under *Garcia* because they did not include a reason for the victim's fear. *Id.* at 287, 625 S.E.2d at 646. The court also stated, "To read *Garcia* as Weston suggests would require us to hold that a witness may testify to the fact that the decedent was afraid, but not that the decedent was afraid **of the defendant.** This is simply too constrained a reading of *Garcia.*" *Id.* at 287–88, 625 S.E.2d at 646. Alternatively, the court noted that even if the testimony had been improperly admitted, Weston had not been prejudiced because two other witnesses gave similar testimony without objection. *Id.* at 288–89, 625 S.E.2d at 646.

In this case, the circuit court erred in admitting some of the challenged testimony, but Hughes cannot demonstrate the necessary resulting prejudice. *See id.* at 288, 625 S.E.2d at 646

("The improper admission of hearsay is reversible error only when the admission causes prejudice."). Specifically, Green testified that when she spoke to Victim on April 8, Victim was "upset because she had found out that [Hughes] had been released by the court, that the solicitor's office had failed to notify her, that she was now going to have to ... be especially careful." Leaphart testified, "[Victim] was not comfortable around [Hughes]. She had some concerns about his ... drug use and his lifestyle. And ... I do know for a fact that she talked about getting into some verbal altercations with him." Additionally, Marion Beachum stated, "[Victim] told me she was deathly afraid of [Hughes]. That if he ever got her alone, he would kill her."

These statements were inadmissible because they not only revealed Victim's state of mind, they described the reasons for her state of mind. *See Garcia*, 334 S.C. at 76, 512 S.E.2d at 509 ("[W]hile the present state of the declarant's mind is admissible as an exception to hearsay, the reason for the declarant's state of mind is not."). Beachum's statement, particularly, closely mirrors the testimony ruled inadmissible in *Garcia. See id.* at 74–76, 512 S.E.2d at 508–09 (holding inadmissible a cousin's testimony that the victim told her if she ever left her boyfriend he would kill her because it improperly revealed the reason for the victim's state of mind).

We find unpreserved Hughes's challenge to Few's testimony. Hughes argues that prior to Few's testimony, the court "overruled a defense objection to his testimony"; however, our review of the record demonstrates the referenced objection was not a hearsay objection but a temporal objection followed by a relevance objection to Few's recounting of a 2010 incident when law enforcement escorted Hughes from Victim's yard after dark.[5]

Hughes did not object to Few's subsequent testimony that on the Thursday before her death, Victim related that she was "very scared" because Hughes had been released and "[s]he was afraid that [Hughes] was going to come in and kill her.

---

5. In 2010, several months after Hughes moved out of Victim's home, Victim called Few's wife to ask him to come over because Hughes was in her yard. Law enforcement responded and found Hughes behind a pecan tree on Victim's property. Victim never came outside while Hughes was present.

158

That's her words." *See State v. Dunbar*, 356 S.C. 138, 142, 587 S.E.2d 691, 694 (2003) ("A party may not argue one ground at trial and an alternate ground on appeal."). Accordingly, we find Hughes failed to preserve a hearsay challenge to Few's testimony. *See State v. Johnson*, 324 S.C. 38, 41, 476 S.E.2d 681, 682 (1996) (requiring a contemporaneous objection to preserve an error during trial).

Significantly, the challenged testimony of Green, Leaphart, and Beachum was cumulative to other testimony presented at trial without objection. Hughes himself elicited testimony from Sergeant Miller on cross-examination that various witnesses gave Miller the impression that Victim feared Hughes.[6] Additionally, Hughes entered an April 7 email into evidence wherein Victim told a friend that while she was pleased Hughes received a strong sentence on the forgery charges, it was "a little un-nerving to know he is out there. The solicitor's office said one mess up [and] he will be sent to prison. Either he rang my doorbell at 7pm last night or God did so he would let me know something was up."

Detective Drew Palmer testified Victim told him several times that she was afraid of Hughes. Palmer elaborated that "after several times of telling me that she was afraid of her son, I said, you know, it probably would be prudent for you to get a weapon." Although Hughes initially made a hearsay objection to Detective Palmer's testimony, he subsequently withdrew it.[7] *See State v. King*, 416 S.C. 92, 112, 784 S.E.2d 252, 262 (Ct. App. 2016) ("[W]here an objection is expressly withdrawn, it cannot be raised on appeal."), *cert. pending*. Finally, Jones testified without objection that Victim was agitated, frustrated, and fearful when she learned Hughes had

6. Hughes's questioning of Sergeant Miller suggests he mistakenly believed Miller had testified about Victim's fear of Hughes on direct examination. However, Miller only testified that when he spoke to Victim's neighbors and coworkers, they were "adamant" about who they suspected of killing her. Miller did give some testimony that could have implied Victim's fear, such as the existence of a no-contact order, the deadbolt on Victim's bedroom door, and Victim's trip to the magistrate's office on the day she died.

7. When the State attempted to introduce email correspondence from Victim to Detective Palmer, Hughes successfully objected as Victim's correspondence detailed threats made by Hughes against his father, uncle, grandmother, and Victim to an old girlfriend in West Virginia.

been released without her knowledge. Accordingly, we analogize this case to *Weston* and believe any inadmissible testimony was cumulative. *See* 367 S.C. at 288–89, 625 S.E.2d at 646 (finding that even if witnesses' testimony concerning victim's fear of defendant was inadmissible, there was no prejudicial error because their testimony was cumulative to other witnesses' testimony that was admitted without objection).

Additionally, any error in admitting the testimony was harmless due to the existence of overwhelming evidence of Hughes's guilt. *See State v. Chavis*, 412 S.C. 101, 110 n.7, 771 S.E.2d 336, 340 n.7 (2015) (stating an error in admitting certain testimony could be deemed harmless because of the existence of overwhelming evidence of guilt); *State v. Mitchell*, 286 S.C. 572, 573, 336 S.E.2d 150, 151 (1985) (finding the erroneous admission of hearsay testimony harmless in light of the other "abundant evidence" of defendant's guilt). The State's evidence established that Hughes was released from jail for forging checks on Victim's trust account and ordered to have no contact with Victim. Nevertheless, Hughes admitted that two days later, he was at Victim's home around the same time a neighbor last reported seeing her alive. Sergeant Miller opined that based on the crime scene, the crime appeared personal rather than random. Victim's manner of death was consistent with the threat Hughes made in Slavensky's presence and his statements to Isakson. Although the DNA match was not definitive, the State's expert opined that one blood sample from the scene had a "high probability" of being a mother/son mixture, and he ruled out Victim's other son as a possible contributor. Finally, when Hughes was apprehended, he was driving Victim's missing car, had possession of her missing keys and garage door opener, and had a cut on one of his fingers. Accordingly, we believe the State presented overwhelming evidence of Hughes's guilt such that any errors in the admission of hearsay testimony were harmless.

## II. Closing Argument

Hughes argues he was denied due process when the trial court failed to require the State to open fully on both the law and the facts and limit its reply to those matters raised in Hughes's closing. Specifically, Hughes contends the current procedure in South Carolina allows the State to "sandbag" its arguments and deny the defense an opportunity to reply.

■ "[T]he conduct of a criminal trial is left largely to the sound discretion of the presiding judge and this Court will not interfere unless it clearly appears that the rights of the complaining party were abused or prejudiced in some way." *State v. Bridges*, 278 S.C. 447, 448, 298 S.E.2d 212, 212 (1982). "The solicitor is not required to make an opening argument to the jury on issues of fact, but may do so in his discretion." *State v. Rodgers*, 269 S.C. 22, 25, 235 S.E.2d 808, 809 (1977) (citation omitted).

■ Here, the State's opening on the law consisted of a cursory statement that it had proven the charges against Hughes beyond a reasonable doubt. The entire "opening on the law" comprised only nine lines of the record. Hughes then made his closing argument, and the State followed by presenting the lengthier portion of its closing argument. Although the State's opening on the law was perfunctory at best, we find no error in the circuit court's denial of Hughes's motion.

Hughes cites the Delaware case of *Bailey v. State* in support of his argument that the State's actions in this case were prejudicial. 440 A.2d 997 (Del. 1982). In *Bailey*, a prosecutor gave opening remarks lasting only five minutes and merely conveyed that "based upon the evidence, the State had proved that the defendant had intentionally killed [the victim]." *Id.* at 1000. After the defendant's closing argument, the prosecutor argued in "rebuttal" for over an hour and discussed the testimony of several witnesses not previously mentioned during either party's arguments. *Id.* at 1001. The Supreme Court of Delaware determined it was "unfair and often highly prejudicial for ... State's counsel to avoid treatment of certain issues in the opening summation so as to deprive defense counsel of the opportunity to reply." *Id.* at 1002. Although the court acknowledged that "[t]he general rule has evolved to give trial courts a modicum of discretion to allow a more substantial rebuttal which is not so narrowly tailored to the scope of defense counsel's summation," it reversed the murder conviction based on the trial court's abuse of discretion in permitting the prosecutor "to utilize the inherently prejudicial 'sandbagging' trial strategy." *Id.*

Our supreme court recently considered *Bailey* in *State v. Beaty*, an appeal of defendant Michael Beaty's conviction and

life sentence for the murder of his girlfriend. *See* —— S.C.
——, ——, ——, —— S.E.2d ——, ——, —— (2016) ("[I]n a
criminal trial where the party with the 'middle' argument
requests, the party with the right to the first and last closing
argument must open in full on the law and the facts, and in
reply may respond in full to the other party's argument but
may not raise new matter.").[8] Like the appellant in this case,
Beaty argued his procedural due process rights were offended
when the circuit court declined to require the State to open
fully on the law and the facts in its initial closing argument.
*Id.* at ——, —— S.E.2d at ——. Although the supreme court
agreed in part with Beaty's due process concern, it found any
error in the circuit court's denial of Beaty's motion to require
the State to "open in full" was harmless beyond a reasonable
doubt. *Id.* at ——, —— S.E.2d at ——. Likewise, we find
Hughes is unable to demonstrate prejudicial error. Our review
of the record reveals that the bulk of the State's closing
argument was confined to content that had already been
raised in Hughes's closing argument. Notably, both sides
addressed many of the same issues including Hughes's motive,
the DNA evidence, the blood evidence, the shoe print evi-
dence, Isakson's believability as a witness, and whether
Hughes's actions in the days following the murder were
consistent with guilt. Therefore, we find any error in the
circuit court's denial of Hughes's motion to require that the
State "open in full and limit its reply" was harmless beyond a
reasonable doubt. *See Chapman v. California*, 386 U.S. 18, 24,
87 S.Ct. 824, 17 L.Ed.2d 705 (1967) (applying a harmless
constitutional violation standard).

## CONCLUSION

Hughes's convictions are

**AFFIRMED.**

LOCKEMY, C.J., and KONDUROS, J., concur.

---

**8.** *Bailey* has been cited favorably by courts in other states. *See Presi v. State*, 73 Md.App. 375, 534 A.2d 370, 370 (Md. Ct. Spec. App. 1987) (noting *Bailey* was one of a handful of reported criminal cases in which convictions have been reversed because the State was allowed to raise a new and prejudicial issue in rebuttal); *Jenner v. Leapley*, 521 N.W.2d 422, 429 (S.D. 1994) (citing *Bailey* for the proposition that a prosecu- tor's tactic of presenting new arguments during his final argument can result in reversible error).