728 S.E.2d 68

**The STATE, Respondent,**

v.

**Kasseem STEPHENS, Appellant.**

**Appellate Case No.2009–122666.**

**No. 4996.**

Court of Appeals of South Carolina.

Heard June 4, 2012.

Decided June 27, 2012.

Chief Appellate Defender Robert Michael Dudek and Appellate Defender Dayne C. Phillips, both of Columbia, for Appellant.

Attorney General Alan McCrory Wilson, Chief Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Donald J. Zelenka, Assistant Attorney General Brendan Jackson McDonald, all of Columbia; and Solicitor Scarlett Anne Wilson, of Charleston, for Respondent.

CURETON, A.J.

Kasseem Stephens appeals his conviction and sentence for murder, arguing the trial court erred in admitting into evidence an unfairly prejudicial and needlessly cumulative photographic array containing his "mug shot." We affirm.

**FACTS**

**I. Incident and Investigation**

On the afternoon of March 27, 2007, Sheldon Frasier parked his car in a North Charleston neighborhood next to Jamol Greene's truck, and the men conversed with a mutual friend. Frasier's fiancée, Kimberly Bates, remained in the car. Soon after Frasier and Bates arrived, a burgundy Cutlass pulled in behind the vehicles, and the driver got out. After arguing briefly with Frasier, the man produced a gun and began firing at Frasier. Bates briefly exited the car and confronted the gunman, giving Frasier the opportunity to run away. After Bates retreated, the gunman returned to the Cutlass and drove away.

Bates located Frasier at a home not far away. One of the bullets had pierced his neck and severed his carotid artery. Alive but bleeding profusely, Frasier denied knowing who had shot him. He died four days later.

Bates described the gunman to police, and as a result, on the day of the shooting, the police presented her with a photographic lineup. However, she did not recognize any of the men in the lineup.

Shortly after the incident, the police located the burgundy Cutlass not far from the scene of the shooting. Inside it, they found a business card advertising automobile detailing by "Nitty." The next day, the police learned Stephens used the nickname "Nitty" and presented Bates with a second photographic lineup. She identified Stephens as the gunman.

The police also determined the Cutlass belonged to Greene, who provided a written statement. Greene indicated Stephens had taken the Cutlass to wash it and identified him as the gunman. Stephens was indicted and tried for murder.

## II. Motion to Suppress

Prior to trial, Stephens moved to suppress Bates's identification of him in the second photographic lineup, arguing (1) the lineup consisted of only six photographs; (2) the images, which were photocopies of photographs, were in black and white and of poor quality; and (3) Bates's identification was unreliable because she viewed the gunman and the lineup during a time of very high emotional stress.

The State presented the testimony of Detective Keith Elmore, who had led the investigation of Frasier's shooting. He stated that after he learned Stephens used the nickname "Nitty," he asked the jail to prepare a six-photograph lineup including Stephens. The only identifying features Detective Elmore provided with this request were Stephens's name and date of birth. The day after the shooting, Detective Elmore showed Bates the lineup with these instructions: "I am just going to show it to you and if you see anybody pertaining to this case, whether they were the witness, [or] had anything to do with the investigation[,] . . . circle it, sign it and tell me what their involvement was." Detective Elmore testified that after Bates looked over the photographs, she pointed to

Stephens and told Detective Elmore "that's the person who shot" Frasier. Bates circled Stephens's photograph and signed and dated the page.

Bates also testified. She recalled sitting inside the car when she first saw the gunman chasing Frasier. She looked at the man for approximately ten seconds. When she exited the car to confront him, she looked at the gunman face to face from a distance of eight to ten feet for approximately five seconds. Bates stated she did not recognize anyone in the first photographic lineup. With regard to the second photographic lineup, Bates described Detective Elmore handing her photographs of six African–American men of the same approximate age and build and asking if she could identify the person who shot Frasier. Bates identified Stephens as the gunman. He was the only person she identified.

The trial court denied Stephens's motion, finding "there [was] really nothing suggestive about the lineup" because each of the men had "similar features[ and] very similar eye structure." In addition, the trial court observed that, while Bates was in a very emotional state when she identified Stephens, her testimony that she did not recognize any of the men in the first lineup suggested she made her identification with care.

## III. Trial

When the trial court admitted the second photographic lineup into evidence, Stephens objected on the same grounds. In an off-the-record conference, he added his contention that the "mug shot" itself suggested he had a prior criminal history. Bates's trial testimony included the events surrounding the shooting and her descriptions to the police of the Cutlass and the gunman. After relating her experiences with the two photographic lineups, she identified Stephens as the man she had picked out of the second lineup and the man who shot Frasier.

In addition, Charles Moore, Greene's brother, testified he was at home asleep on the day of the shooting. Between 4:00 and 5:00 in the afternoon, Stephens stopped by and announced he was going to wash the Cutlass. Moore recalled Stephens stayed and talked for five to ten minutes, left in the Cutlass

for another five to ten minutes, and then returned to pick up a red Grand Am.

In his defense, Stephens first presented an expert witness who testified to the fallibility of human memory in eyewitness identifications. He also presented Amber Moore, sister of Greene and Moore. Amber testified she arrived home from school at about 3:30 p.m. on the day of the shooting and "went straight to sleep." She remembered being awoken by a commotion outside and being escorted out of the house. However, her memory faltered when Stephens examined her about a statement she gave police on the day of the shooting, indicating the Cutlass was parked in the driveway as late as 4:00 p.m. that day.

The jury found Stephens guilty of murder, and he received a sentence of forty years' imprisonment. This appeal followed.

## STANDARD OF REVIEW

In criminal cases, the appellate court sits to review errors of law only and is bound by the factual findings of the trial court unless clearly erroneous. *State v. Wilson*, 345 S.C. 1, 5, 545 S.E.2d 827, 829 (2001). The admission or exclusion of evidence is a matter within the trial court's sound discretion, and an appellate court may disturb a ruling admitting or excluding evidence only upon a showing of a manifest abuse of discretion accompanied by probable prejudice. *State v. Gillian*, 373 S.C. 601, 613, 646 S.E.2d 872, 878 (2007). "An abuse of discretion occurs when the conclusions of the trial court either lack evidentiary support or are controlled by an error of law." *State v. Pagan*, 369 S.C. 201, 208, 631 S.E.2d 262, 265 (2006).

## LAW/ANALYSIS

Stephens asserts the trial court erred in admitting the second photographic lineup because the unfairly prejudicial effect of the lineup significantly outweighed any probative value. In particular, he argues the unfair prejudice arose from the danger that the jury would conclude the police had his "mug shot" from a prior arrest. We disagree.

A trial judge's decision regarding the comparative probative value and prejudicial effect of evidence should be reversed only in "exceptional circumstances." We review a trial

court's decision regarding Rule 403 pursuant to the abuse of discretion standard and are obligated to give great deference to the trial court's judgment. A trial judge's balancing decision under Rule 403 should not be reversed simply because an appellate court believes it would have decided the matter otherwise because of a differing view of the highly subjective factors of the probative value or the prejudice presented by the evidence. If judicial self-restraint is ever desirable, it is when a Rule 403 analysis of a trial court is reviewed by an appellate tribunal.

*State v. Hamilton,* 344 S.C. 344, 357–58, 543 S.E.2d 586, 593–94 (Ct.App.2001) (citations omitted), *overruled on other grounds by State v. Gentry,* 363 S.C. 93, 107, 610 S.E.2d 494, 502 (2005).

"Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Rule 403, SCRE. "Unfair prejudice means an undue tendency to suggest a decision on an improper basis." *State v. Lyles,* 379 S.C. 328, 338, 665 S.E.2d 201, 206 (Ct.App.2008) (internal quotation marks omitted). A court weighing the prejudicial effect of evidence against its probative value must base its determination upon the entire record and upon the particular facts of the case before it. *Id.*

The trial court did not err in admitting the photographic lineup. At trial, Bates and Detective Elmore testified Bates identified Stephens as the gunman when she viewed the second photographic lineup the police provided her. Stephens argues that the unfair prejudice of admitting the "mug shot" photograph substantially outweighs its probative value. He also argues that, coupled with Bates's in-court identification of him, the introduction of the photographic lineup at trial was needlessly cumulative. We disagree.

The central theme of Stephens's defense was discrediting Bates's identification of him in the second photographic lineup. In a pretrial motion, Stephens argued to suppress the lineup because Bates's identification was unreliable and unduly suggestive. During the State's case-in-chief, Stephens cross-

examined Bates and Detective Elmore extensively concerning the content of the lineup and how the detective presented it to Bates. In his defense, Stephens presented only two witnesses. One of them was an expert who opined that stress and other factors surrounding a crime can further compromise an already imperfect human memory, resulting in misidentification. Finally, in his closing argument, Stephens capitalized on Bates's emotional distress and distraction at the time of the shooting, questioned whether she accurately counted the number of shots fired, and criticized the manner in which the photographs were presented to her.

Throughout the trial, Stephens consistently attacked the reliability of Bates's identification of him in the lineup. By doing so, he made the photographic lineup far more important than it might otherwise have been, thereby increasing its probative value. Only by viewing the actual lineup could the jury determine for itself whether the allegedly poor picture quality or the six-photograph format likely influenced Bates's identification. Before the trial court and this court, however, Stephens failed to demonstrate the admission of the lineup caused him unfair prejudice that outweighed the lineup's probative value. The increased probative value resulting from Stephens's attacks on the reliability of Bates's identification also means the photos were not "needlessly" cumulative. Accordingly, the trial court did not err in admitting it.

■ Stephens's remaining argument, that his "mug shot" in the photographic lineup implied he had a prior criminal record, is unpersuasive on its face. Our appellate courts have affirmed the admission of photographic lineups that were more suggestive of a prior criminal record than the one in this case. *See, e.g., State v. Denson,* 269 S.C. 407, 412–13, 237 S.E.2d 761, 764 (1977) (finding no error in admitting photographic lineup despite the fact photographs included placards that were taped over to conceal arrest information); *State v. Robinson,* 274 S.C. 198, 199–200, 262 S.E.2d 729, 730 (1980) (affirming admission of photographic lineup comprised of full frontal, profile, and frontal head-and-shoulders images with written information blacked out); *State v. Davis,* 309 S.C. 326, 338–39, 422 S.E.2d 133, 141 (1992), *overruled on other grounds by Brightman v. State,* 336 S.C. 348, 352 n. 5, 520 S.E.2d 614, 616 n. 5 (1999) (affirming admission of photographic lineup

using mug shots with identifying information masked). The photographic lineup in the instant case is most similar to the lineup in *State v. Ford*, 334 S.C. 444, 450 n. 3, 513 S.E.2d 385, 388 n. 3 (Ct.App.1999), the admissibility of which was affirmed because each photograph showed only the subject's head and neck but no placard or clothing. Each image in Stephens's photographic lineup shows a subject's head and neck against a blank background and bears no identifying marks as to date, location, agency, or purpose of the photograph. Each subject is wearing street clothes. The photographs at issue here could have come from driver's licenses, employee identification badges, or other sources. Accordingly, the trial court did not err in finding Stephens's photograph did not imply Stephens had a prior criminal record.

## CONCLUSION

We find that, at trial, Stephens adopted a strategy of attacking the reliability of Bates's identification of him in the second photographic lineup and that his strategy greatly increased the probative value of the second photographic lineup. Furthermore, we find Stephens has not demonstrated any prejudice that outweighs this probative value. Finally, we find nothing in Stephens's photograph implied he had a prior criminal record. Accordingly, the trial court's decision to admit the second photographic lineup is

AFFIRMED.

FEW, C.J., and HUFF, J., concur.