807 S.E.2d 710

**The STATE, Respondent,**

**v.**

**Earnest Stewart DAISE, Appellant.**

**Appellate Case No. 2013-002394**
**Opinion No. 5520**

Court of Appeals of South Carolina.

Heard March 9, 2017
Filed October 25, 2017
Rehearing Denied December 14, 2017

444

Allen Mattison Bogan and Phillips Lancaster McWilliams, both of Nelson Mullins Riley & Scarborough, LLP, of Columbia; and Chief Appellate Defender Robert Michael Dudek, of Columbia, for Appellant.

Attorney General Alan McCrory Wilson, Chief Deputy Attorney General, John W. McIntosh, and Senior Assistant Deputy Attorney General Donald J. Zelenka, of Columbia; and Solicitor Isaac McDuffie Stone, III, of Bluffton, for Respondent.

MCDONALD, J.:

Earnest Daise appeals his convictions for murder, assault and battery with intent to kill, possession with intent to

distribute marijuana, and trafficking in cocaine. Daise argues the circuit court erred in (1) allowing a witness to offer hearsay violative of the Confrontation Clause, (2) permitting a witness to comment on the credibility of another witness, (3) admitting testimony that a victim feared Daise, (4) failing to require the State to produce materials that allegedly amount to a "handbook" on circumventing a *Batson* challenge, (5) admitting a photograph of Daise in a custodial pose, and (6) admitting two photographs in which a child victim's birthday cake is visible. Finally, Daise argues the circuit court's cumulative errors denied him a fair trial. We affirm the convictions.

## I. Facts and Procedural History

Jeanine Mullen was the mother of four children, Child 1, Child 2, John Doe 1 (four years old), and John Doe 2 (two years old). Jeanine was involved in a romantic relationship with Daise—the father of John Doe 2—at the time of the murders.

On the morning of November 15, 2009, Daise left Jeanine's Beaufort County home in her white van. Video surveillance showed Daise with the van at a gas station between 11:45 a.m. and 12:18 p.m. Jeanine's attempts to reach Daise to have him return the van, which she needed to prepare for John Doe 1's fourth birthday party, were unsuccessful. Phone records established that between 11:39 a.m. and 3:52 p.m. on November 15, Jeanine called Daise eighteen times. Although most of the calls went to voicemail, the 3:52 p.m. call lasted twenty-eight seconds. Around dusk,[1] Daise was seen with the van at Eddie's Disco, where he was overheard telling someone on the phone, "Who the f*** you think you talking to?"

Sometime between 6:30 p.m. and 7:00 p.m., Jeanine's father, Frank Mullen, arrived at Jeanine's home to drop off the two older children. The group noticed Jeanine's white van parked in the driveway—the doors were open and it appeared "ransacked." Inside the home, Frank found John Doe 1's body in the kitchen and Jeanine's body in her bedroom.[2] Although

---

1. The court took judicial notice that the sun set that day at 5:22 p.m., with twilight ending at 5:48 p.m.

2. John Doe 1 died from a gunshot wound to the head. Likewise, Jeanine died from a gunshot wound to the head, but she had an additional

John Doe 2 was still alive, he had also been shot and was lying near Jeanine. The only item missing from the home was a .38 pistol.

Around 2:00 a.m. on the morning of November 16, police apprehended Daise at the home of his friend, Jay Simmons. Daise had his own bedroom in the home, and a search of that bedroom revealed half a pound of marijuana, an electronic scale, ammunition commonly associated with an AK-47, a set of keys that fit the doors and ignition of Jeanine's white van,[3] twenty-six grams of crack cocaine, and Daise's cell phone. Police also documented a red smear on the door into the bedroom, noted what appeared to be "fresh" blood on the front-left pocket of Daise's blue jeans, and photographed a cut on Daise's right hand. During his initial interview, Daise denied being at Jeanine's home or driving her van.

At trial, the State introduced phone records showing Daise made nine calls to Simmons between 6:00 p.m. and 6:18 p.m. Simmons initially testified that sometime after 6:00 p.m., he picked up Daise on the side of the road and gave him a ride.[4] Simmons sent Daise a text message at 6:04 p.m. that he was "on the way." On cross-examination, Simmons admitted to sending the text but insisted he never picked up Daise. Simmons claimed police threatened to charge him as an accessory if he did not say he picked up Daise.

A trace evidence expert testified she found gunshot residue on the blue jeans Daise was wearing when he was apprehended. On cross-examination, she admitted she only found one single particle of gunshot residue on each leg of the jeans and acknowledged gunshot residue can remain on unwashed clothing for many months. She also testified there was no gunshot residue on Daise's sweatshirt.

gunshot wound on her left thigh. The State's pathologist opined Jeanine's head wound was caused by a gun being placed directly against her head.

3. Another set of keys, which unlocked the back door to Jeanine's home, and a purse were found in the passenger seat of the van.

4. A police officer testified that the location where Simmons indicated he picked up Daise was 1.6 miles from the crime scene.

A DNA expert testified the red smear on the door in Simmons's home was comprised of Daise's blood. Testing revealed blood from both Daise and Jeanine on the blue jeans.

The jury found Daise guilty of two counts of murder, one count of assault and battery with intent to kill, one count of possession with intent to distribute marijuana, and one count of trafficking cocaine between ten and twenty-eight grams. Daise received sentences of life without parole on the murder charges and consecutive sentences totaling seventy years' imprisonment on the remaining charges.

## II. EMT Testimony

Daise argues the circuit court erred when it allowed emergency medical technicians (EMTs) to testify about twenty-eight-month-old John Doe 2's responses to questioning regarding who caused his injuries.

Before trial, the State indicated it planned to introduce evidence that John Doe 2 told EMTs "Daddy" hurt him. Relying on *Michigan v. Bryant*,[5] the State argued the evidence was nontestimonial in nature and, therefore, did not violate Daise's right to confront his accuser. The circuit court agreed the statement was nontestimonial and allowed the State to introduce it.

At trial, EMT Scott Sampson testified that when he entered Jeanine's home, he found two individuals who appeared to be deceased. He also found John Doe 2, who was breathing, whimpering, and crying but only responsive to "painful stimuli." Sampson disrobed John Doe 2 to locate his injuries and turned him over to Paramedic Shayna Orsen.

Orsen testified she arrived on the scene with EMT Crew Chief Paramedic Danny Tinnel, who remained in the ambulance. Orsen further testified John Doe 2 was "unresponsive" and "unconscious" when he was given to her. After placing him on the stretcher, Orsen and Tinnel assessed John Doe 2 for signs of trauma and found one bullet wound to his chest and another behind his ear. Tinnel administered an IV (normal saline fluid drip) while Orsen treated the chest wound.

---

5. 562 U.S. 344, 377–78, 131 S.Ct. 1143, 179 L.Ed.2d 93 (2011) (holding the admission of victim's statements in response to police questioning not violative of the Confrontation Clause because their primary purpose was to assist police officers during an ongoing emergency).

On the way to the hospital, John Doe 2 became responsive. Tinnel immediately began questioning him regarding "person, place, time, and event," which Tinnel explained they do "with just about every patient." Specifically, Tinnel asked John Doe 2 for his name and it "sounded like" he responded "Dub" or "Doug." [6] Tinnel then asked John Doe 2 several more questions, including "how it happened" and "who hurt him." John Doe 2 responded "Daddy" hurt him but was unable to respond to any additional questions including "what his daddy's name was."

## A. Hearsay

■ Daise argues the circuit court erred in allowing the challenged testimony because it constitutes inadmissible hearsay.[7]

■ "It is well-settled that an issue cannot be raised for the first time on appeal, but must have been raised to and ruled upon by the trial court to be preserved for appellate review." *Staubes v. City of Folly Beach*, 339 S.C. 406, 412, 529 S.E.2d 543, 546 (2000). "Error preservation requirements are intended 'to enable the lower court to rule properly after it has considered all relevant facts, law, and arguments.'" *Id.* (quoting *I'On v. Town of Mt. Pleasant*, 338 S.C. 406, 422, 526 S.E.2d 716, 724 (2000)). "In order to preserve for review an alleged error in admitting evidence an objection should be sufficiently specific to bring into focus the precise nature of the alleged error so it can be reasonably understood by the trial judge." *State v. Prioleau*, 345 S.C. 404, 411, 548 S.E.2d 213, 216 (2001).

■ Our review of the record reveals that at no time during the trial proceedings did Daise make a hearsay objection to the challenged testimony. *See State v. Hoffman*, 312 S.C. 386,

---

6. John Doe 2's grandmother and his older half-brother testified John Doe 2's nicknames included "Dub," "Little Dub," and "J-Dub."

7. Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted" and is inadmissible unless it falls within one of the enumerated exceptions to the hearsay rule. Rules 801(c) & 802, SCRE.

393, 440 S.E.2d 869, 873 (1994) ("A contemporaneous objection is required to properly preserve an error for appellate review."). His only objection to John Doe 2's statement that "Daddy" hurt him was to "renew our *Crawford*[8] objection," which Daise initially made at a pretrial hearing. *See* Rule 103(a)(1), SCRE (stating a party must state "the specific ground of objection, if the specific ground was not apparent from the context"). On appeal, Daise first argued the challenged testimony was inadmissible under the medical diagnosis or treatment exception to the hearsay rule.[9] *See State v. Freiburger*, 366 S.C. 125, 134, 620 S.E.2d 737, 741 (2005) (explaining an argument advanced on appeal but not raised and ruled on below is not preserved). In his reply brief, Daise set forth additional arguments that the challenged testimony was inadmissible under the present sense impression[10] and excited utterance[11] exceptions to the hearsay rule. However, "an argument made in a reply brief cannot present an issue to the appellate court if it was not addressed in the initial brief." *Glasscock, Inc. v. U.S. Fid. & Guar. Co.*, 348 S.C. 76, 81, 557 S.E.2d 689, 692 (Ct. App. 2001). Therefore, we find the hearsay arguments unpreserved for our review.

## B. Confrontation Clause

Daise further argues that even if the challenged testimony is not hearsay, it violated his Sixth Amendment right to confront his accuser.

---

8. *Crawford v. Washington*, 541 U.S. 36, 68, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004) (holding out-of-court testimonial statements by witnesses are inadmissible under the Sixth Amendment's Confrontation Clause unless the witnesses are unavailable and defendants had prior opportunity to cross-examine them).

9. Statements made for the purpose of medical diagnosis or treatment "are not excluded by the hearsay rule, even though the declarant is available as a witness." Rule 803(4), SCRE.

10. Rule 803(1), SCRE, defines a "present sense impression" as "[a] statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter."

11. An excited utterance is "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Rule 803(2), SCRE.

Paramedic Tinnel testified that in response to questioning, John Doe 2 stated "Daddy" hurt him. Tinnel explained he began questioning John Doe 2 immediately after he became responsive in order to "keep him awake and talking," "find out if he had any other injuries," and "determine his level of responsiveness." Just as he does with other patients, Tinnel questioned John Doe 2 regarding "person, place, time, and event." Tinnel clarified "[t]he purpose we were going after was to determine his level of consciousness and to determine his cognitive thought process, especially with the possibility of a gunshot wound to the head."

The Confrontation Clause of the Sixth Amendment to the United States Constitution demands that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him[.]" U.S. Const. amend. VI. In *Pointer v. Texas*, the United States Supreme Court held "the Sixth Amendment's right of an accused to confront the witnesses against him is ... a fundamental right and is made obligatory on the States by the Fourteenth Amendment." 380 U.S. 400, 403, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965).[12]

The Supreme Court again addressed the Confrontation Clause in *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). Crawford was convicted of assaulting a man who allegedly tried to rape his wife. *Id.* at 38, 124 S.Ct. 1354. At trial, the State introduced the wife's tape-recorded statement describing the stabbing to the police, despite the fact Crawford had no opportunity to cross-examine her. *Id.* The Court reversed Crawford's conviction and held the admission of a testimonial hearsay statement against an accused violates the Confrontation Clause if: (1) the declarant is unavailable to testify at trial, and (2) the accused has had no prior opportunity to cross-examine the declarant. *Id.* at 54, 124 S.Ct. 1354. Thus, the Confrontation Clause may operate to render otherwise admissible hearsay evidence inadmissible if

---

12. In pertinent part, the Fourteenth Amendment to the United States Constitution provides, "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

it is testimonial in nature. *See id.* at 68, 124 S.Ct. 1354. Although the Court declined to comprehensively define "testimonial," it did declare that the "core class of 'testimonial' statements" includes: (1) "ex parte in-court testimony or its functional equivalent"; (2) " 'extrajudicial statements ... contained in formalized testimonial materials' "; (3) statements made under circumstances leading an objective witness to reasonably believe they would be available for use at a later trial; and (4) "[s]tatements taken by police officers in the course of interrogations." *Id.* at 51–52, 124 S.Ct. 1354 (quoting *White v. Illinois,* 502 U.S. 346, 365, 112 S.Ct. 736, 116 L.Ed.2d 848 (1992) (Thomas, J., concurring in part and concurring in judgment)).

In *Davis v. Washington,* decided jointly with *Hammon v. Indiana,* the Supreme Court addressed the Confrontation Clause in the context of two domestic violence cases. 547 U.S. 813, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006). Announcing what has come to be known as the "primary purpose" test, the Court explained "[s]tatements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose ... is to enable police assistance to meet an ongoing emergency," however, statements "are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." *Id.* at 822, 126 S.Ct. 2266. The Court found the *Davis* victim's identification of her abuser in response to initial questioning from a 911 emergency operator was nontestimonial. *Id.* at 826–29, 126 S.Ct. 2266. In *Hammon,* however, the Court held that when police responded to a domestic disturbance, found the couple at home, and took a statement from the wife about the husband's abuse while the husband was in another room, wife's statements were testimonial. *Id.* at 829–34, 126 S.Ct. 2266.

In *Michigan v. Bryant,* police officers responding to a radio dispatch found a man lying in a gas station parking lot with a gunshot wound to his abdomen. 562 U.S. at 349, 131 S.Ct. 1143 (2011). Before the victim was removed from the scene, the police officers asked "what had happened, who had shot him, and where the shooting had occurred." *Id.* (quoting *People v.*

*Bryant*, 483 Mich. 132, 143, 768 N.W.2d 65, 71 (2009)). At trial, the officers were permitted to testify that the victim, who was now deceased, told them Bryant shot him as well as when and where the shooting occurred. *Id.* The Supreme Court held the victim's statement to police was nontestimonial because the officers' "primary purpose was simply to address what they perceived to be an ongoing emergency, and the circumstances lacked any formality that would have alerted [the victim] to or focused him on the possible future prosecutorial use of his statements." *Id.* at 377, 131 S.Ct. 1143. "[T]he relevant inquiry is not the subjective or actual purpose of the individuals involved in a particular encounter, but rather the purpose that reasonable participants would have had, as ascertained from the individuals' statements and actions and the circumstances in which the encounter occurred." *Id.* at 360, 131 S.Ct. 1143. "[T]he statements and actions of both the declarant and interrogators provide objective evidence of the primary purpose of the interrogation." *Id.* at 367, 131 S.Ct. 1143. The Court carefully added that "giv[ing] controlling weight to the 'intentions of the police'" would be "a misreading of our opinion," instructing lower courts to consider "all of the relevant circumstances" in determining whether statements are testimonial. *Id.* at 369, 131 S.Ct. 1143. "'The identity of an interrogator, and the content and tenor of his questions,' can illuminate the 'primary purpose of the interrogation.'" *Id.* (citations omitted).

More recently, the Supreme Court again addressed the Confrontation Clause in *Ohio v. Clark*, —— U.S. ——, 135 S.Ct. 2173, 192 L.Ed.2d 306 (2015). Clark was convicted of felonious assault, child endangerment, and domestic violence arising from his physical abuse of his girlfriend's three-year-old son and eighteen-month-old daughter. *Id.* at 2177–78. The three-year-old's preschool teachers observed visible injuries to his eye, face, and chest. *Id.* at 2178. When the lead teacher asked, "[w]ho did this" and "[w]hat happened to you," the child responded "Dee, Dee." *Id.* The Court held the child's statement was not testimonial (even though it required his teachers to report the abuse) because "a statement cannot fall within the Confrontation Clause unless its primary purpose was testimonial." *Id.* at 2180–81. "Where no such primary purpose exists, the admissibility of a statement is the concern

of state and federal rules of evidence, not the Confrontation Clause." *Id.* at 2180 (quoting *Bryant*, 562 U.S. at 359, 131 S.Ct. 1143). In addressing "whether statements to persons other than law enforcement officers are subject to the Confrontation Clause," the Supreme Court "decline[d] to adopt a categorical rule" but noted "such statements are much less likely to be testimonial than statements to law enforcement officers." *Id.* at 2181. The Court identified several circumstances contributing to its determination, including the fact that the questions and answers "were primarily aimed at identifying and ending the threat" and protecting the child-victim, the conversation between the child and his teachers was "informal and spontaneous," the declarant was three years old at the time of his statement, and the teachers were not "principally charged with uncovering and prosecuting criminal behavior." *Id.* at 2181–82. *See also State v. Ladner*, 373 S.C. 103, 113–15, 644 S.E.2d 684, 689–90 (2007) (statements made by two-and-a-half year old girl to her caretakers immediately after the discovery of her injury were nontestimonial and, thus, not admitted in violation of *Crawford*).

■ We find John Doe 2's statement in response to the EMT questioning was nontestimonial. The statement occurred in an ambulance on the way to the hospital during an ongoing medical emergency—facts that distinguish this case from *Crawford*'s formal police interrogations at the station. *See* 541 U.S. at 38–40, 124 S.Ct. 1354 (explaining that following his arrest, Crawford and his wife were both interrogated twice). Nor are the circumstances in this case akin to the police interrogation and battery affidavit in *Hammon*, where officers knew the identity of the attacker and questioned the victim only after they had safeguarded her from potential harm. 547 U.S. at 829–34, 126 S.Ct. 2266.

The conversation between Paramedic Tinnel and John Doe 2 is closer to that of a victim's identification of his or her abuser in response to initial questioning from a 911 emergency operator or a teacher. *See Davis*, 547 U.S. at 826–29, 126 S.Ct. 2266; *Clark*, 135 S.Ct. at 2178. Tinnel explained "[t]he purpose we were going after was to determine [John Doe 2's] level of consciousness and to determine his cognitive thought process, especially with the possibility of a gunshot wound to the head." As the Supreme Court held in *Bryant*, we find the "primary

purpose" of the questioning in this case—what is your name, how did this happen, who did this to you, and who is your daddy—was "simply to address what they perceived to be an ongoing emergency, and the circumstances lacked any formality that would have alerted [the victim] to or focused him on the possible future prosecutorial use of his statements." 562 U.S. at 377, 131 S.Ct. 1143. Tinnel's objective was to keep John Doe 2 "awake and talking," "find out if he had any other injuries," and "determine his level of responsiveness" during an ongoing medical emergency.

The Supreme Court's holding in *Clark* further supports the circuit court's conclusion and our opinion that the introduction of the challenged testimony here did not violate the Confrontation Clause. *See Clark*, 135 S.Ct. at 2181 ("The teachers asked [the child-victim] about his injuries immediately upon discovering them, in the informal setting of a preschool lunchroom and classroom, and they did so precisely as any concerned citizen would talk to a child who might be the victim of abuse."). Likewise, the conversation in the ambulance was spontaneous because Tinnel began questioning John Doe 2 immediately after he became responsive, as he testified he does "with just about every patient."

John Doe 2's very young age further reinforces our conclusion that the challenged testimony was not testimonial. *See id.* at 2182 ("Statements by very young children will rarely, if ever, implicate the Confrontation Clause. Few preschool students understand the details of our criminal justice system.... [and research shows] young children 'have little understanding of prosecution.' "). No twenty-eight-month-old child in John Doe 2's position would intend for his statement to substitute for trial testimony. Certainly, this child, who possibly witnessed his mother and brother shot to death and, at the very least, was left alone in a room with his dead mother and severe injuries of his own, was not making a statement for future prosecutorial use as he became responsive in the ambulance. As *Clark* explains, "a young child in these circumstances would simply want the abuse to end, would want to protect other victims, or would have no discernible purpose at all." *Id.* at 2182. Similarly, the circuit court cogently addressed John Doe 2's very young age in determining the statement was nontestimonial.

Finally, although the Supreme Court has declined to adopt a categorical rule that statements to individuals who are not law enforcement officers fall outside the testimonial scope of the Sixth Amendment's Confrontation Clause, the fact that John Doe 2 was speaking to an EMT during an ongoing medical emergency remains highly relevant to our determination. After a thorough review of the record before us, we find the admission of the challenged statement did not violate the Confrontation Clause. Thus, we affirm the circuit court's admission of John Doe 2's responses to the EMTs caring for him in the ambulance.

### III. Sgt. Fraser's Testimony

■ Daise argues the circuit court erred in allowing Staff Sergeant Jeremiah Fraser to impermissibly comment on the credibility of Jay Simmons's conflicting statements to police. Daise contends he is entitled to a new trial because witness credibility is a matter within the exclusive province of the jury, and one witness is not allowed to testify as to the truthfulness of another.

Simmons gave conflicting testimony regarding Daise's activities and demeanor on the date of the shootings. Simmons's trial testimony was consistently conflicting; he also provided conflicting accounts to law enforcement during the investigation. Specifically, on direct examination, Simmons denied talking with Daise on the evening of the murders. Simmons testified he picked up Daise approximately a mile from the crime scene after sending him the "on the way" text, dropped him off near the tracks on Poppy Hill Road, and was back home before his girlfriend arrived at 7:00 p.m. Simmons stated Daise "seemed alright" when he picked him up and he denied previously telling Sergeant Fraser that Daise acted like he had been robbed and was stressed out. On cross-examination, Simmons testified he told police he picked up Daise from the side of the road near the crime scene only after law enforcement threatened to charge him with accessory after the fact. Simmons then stated he gave Daise a "ride to the store" before subsequently testifying he never picked up Daise at all. Simmons acknowledged texting Daise that he was "on the way" but stated he was unable to find Daise.

■ Thereafter, the State called Fraser to explain why police questioned Simmons on both November 15 and November 18, 2009:

Q: [W]hen you talked to Jay Simmons [on November 18, 2009], had he been talked to already by other officers?

A: Yes, he had.

Q: And was the story that he gave those officers credible?

A: No, it was not.

. . .

Q: Did you have information that led you to believe that those stories were not credible?

A: Yes, we did.

. . .

Q: Is that why you wanted to interview him again?

A: Yes, sir, that's correct.

Fraser explained Daise gave law enforcement one story before he was confronted with his cell phone and the "on the way" text but provided an alternative version of events after the confrontation.

The credibility of a witness may be attacked or supported by evidence in the form of opinion or reputation, but subject to these limitations: (1) the evidence may refer only to character for truthfulness or untruthfulness, and (2) evidence of truthful character is admissible only after the character of the witness for truthfulness has been attacked by opinion or reputation evidence or otherwise.

Rule 608(a), SCRE. "Our courts have previously held that '[t]he assessment of witness credibility is within the exclusive province of the jury,' and that witnesses generally are 'not allowed to testify whether another witness is telling the truth.'" *State v. Kromah*, 401 S.C. 340, 358, 737 S.E.2d 490, 499–500 (2013) (quoting *State v. McKerley*, 397 S.C. 461, 464, 725 S.E.2d 139, 141 (Ct. App. 2012) (alteration in original)). Moreover, "[i]t is improper for the solicitor to cross-examine a witness in such a manner as to force him to attack the veracity of another witness. This error is reversible if the accused is unfairly prejudiced thereby." *State v. Bryant*, 316 S.C. 216, 221, 447 S.E.2d 852, 855 (1994) (quoting *State v. Sapps*, 295 S.C. 484, 486, 369 S.E.2d 145, 145–46 (1988)).

Considering the record as a whole, we find Fraser's testimony regarding the credibility of Simmons's conflicting statements constituted improper witness pitting. However, because Simmons gave inconsistent statements throughout his own trial testimony, he effectively impeached his own credibility. *See Thrift v. State*, 302 S.C. 535, 537, 397 S.E.2d 523, 525 (1990) ("[I]mproper 'pitting' constitutes reversible error only if the accused was unfairly prejudiced."); *State v. Hariott*, 210 S.C. 290, 298, 42 S.E.2d 385, 388 (1947) ("[A]n accused cannot avail himself of error as a ground for reversal where the error has not been prejudicial to him."). Although a witness is generally not allowed to testify as to the truthfulness of another witness, Fraser's assertion that Simmons's November 15 statement was not credible because it was inconsistent with his November 18 statement was merely cumulative to Simmons's own inconsistent testimony. *See State v. Blackburn*, 271 S.C. 324, 329, 247 S.E.2d 334, 337 (1978) ("Under settled principles, the admission of improper evidence is harmless where it is merely cumulative to other evidence."). Fraser never stated Simmons's trial testimony was not credible—only that he did not find Simmons's initial police statement credible given that Simmons initially denied owning a cell phone, which was demonstrably false. Thus, Daise was not prejudiced by Fraser's testimony.

## IV. Fear Testimony

Daise challenges the testimony of Jeanine's coworker and friend, Alleen Porter, arguing the circuit court erred in admitting her testimony that Jeanine feared Daise.

At trial, the State proffered Porter's testimony. During the proffer, Porter testified Jeanine "was terrified of [Daise]" and wanted to leave him. Due to their volatile relationships, Porter and Jeanine formed a safety plan. Porter explained that she and Jeanine communicated at certain times throughout the night and on weekends to make sure each was okay. Porter also testified that she overheard arguments between Jeanine and Daise. On a specific instance, Porter overheard Daise tell Jeanine, "I'll kill you and your mother f'ing kids." The circuit court concluded Porter's testimony was admissible but explained she could not testify about why Jeanine feared Daise.

460

Rule 803(3), SCRE, provides that a statement 'of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed' is not excluded by the hearsay rule. *State v. Hughes*, 419 S.C. 149, 155, 796 S.E.2d 174, 178 (Ct. App. 2017). "Our supreme court has held that 'while the present state of the declarant's mind is admissible as an exception to hearsay, the reason for the declarant's state of mind is not.' " *Id.* (quoting *State v. Garcia*, 334 S.C. 71, 76, 512 S.E.2d 507, 509 (1999)). "The court cautioned that '[i]f the reservation in the text of the rule is to have any effect, it must be understood to narrowly limit those admissible statements to declarations of condition—"I'm scared"—and not belief— "I'm scared because [someone] threatened me." ' " *Id.* at 155– 56, 796 S.E.2d at 178 (quoting *Garcia*, 334 S.C. at 76, 512 S.E.2d at 509).

In this case, the circuit court erred in admitting some of Porter's testimony; however, such admission did not cause Daise prejudice. *See State v. Weston*, 367 S.C. 279, 288, 625 S.E.2d 641, 646 (2006) ("The improper admission of hearsay is reversible error only when the admission causes prejudice.").

 At trial, Porter testified Jeanine "was terrified of him" and wanted to leave him. Porter also testified about overhearing Daise threaten to kill Jeanine and her children. We find these statements were inadmissible because they not only revealed Jeanine's fearful state of mind, they described the reason for it. *See Garcia*, 334 S.C. at 76, 512 S.E.2d at 509 ("[W]hile the present state of the declarant's mind is admissible as an exception to hearsay, the reason for the declarant's state of mind is not."). Porter's statement closely emulates the testimony ruled inadmissible in *Garcia. See id.* at 74–76, 512 S.E.2d at 508–09 (holding a witness's testimony was improperly admitted under Rule 803 stating, "[w]hile their testimony presents circumstantial evidence of the decedent's fear of appellant and concern for her safety, the testimony improperly reveals the reason for her state of mind (i.e., that appellant had kicked and threatened to kill her)"). Nevertheless, this testimony was cumulative to Frank's testimony that his

daughter feared Daise and planned to end the relationship, which was presented without objection. Accordingly, we find any inadmissible testimony was cumulative such that Daise cannot demonstrate prejudice. *See Weston*, 367 S.C. at 288–89, 625 S.E.2d at 646 (finding even if witnesses' testimony concerning victim's fear of the defendant was inadmissible, there was no prejudicial error because it was cumulative to other witnesses' testimony admitted without objection); *see also Hughes*, 419 S.C. at 156–57, 796 S.E.2d at 179 (explaining that although the circuit court erred in admitting some of the testimony, the appellant could not demonstrate the necessary resulting prejudice).

Additionally, any error in admitting Porter's testimony was harmless due to the other overwhelming evidence of Daise's guilt. *See State v. Chavis*, 412 S.C. 101, 110 n.7, 771 S.E.2d 336, 340 n.7 (2015) (stating an error in admitting certain testimony could be deemed harmless because of the existence of overwhelming evidence of guilt); *State v. Mitchell*, 286 S.C. 572, 573, 336 S.E.2d 150, 151 (1985) (finding the erroneous admission of hearsay testimony harmless in light of the other "abundant evidence" of defendant's guilt). Phone records revealed that between 11:39 a.m. and 3:52 p.m. on November 15, 2009, Jeanine called Daise eighteen times. Child 1 testified Daise drove the white van away from Jeanine's home on the morning of November 15. Video surveillance shows Daise had the van at a gas station shortly before noon, and he was seen driving the van near Eddie's Disco around dusk. Frank, Child 1, and Child 2 arrived back at Jeanine's around 7:00 p.m., where they saw the "ransacked" van in the driveway. Inside the home, Frank discovered Jeanine, John Doe 1, and John Doe 2. Contrary to Daise's claim that he was not in the vicinity of the residence on the evening of the incident, Simmons testified he picked up Daise about a mile from Jeanine's and dropped him off near the tracks on Poppy Hill Road. Further, when Daise was arrested, gunshot residue and traces of Jeanine's blood were found on his jeans. Thus, we find the State presented overwhelming evidence of guilt such that any error in the admission of the "fear" statements was harmless.

## V. *Batson* Materials

Daise argues the circuit court erred in refusing to require the State to produce certain prosecutorial training

materials regarding jury selection. Daise asserts African-American jurors are struck disproportionately in Beaufort County, and the court's failure to require disclosure of the State's *Batson*[13] "handbook" prevented him from making a viable *Batson* challenge.

Before trial, Daise subpoenaed the records custodian of the South Carolina Commission on Prosecution Coordination (the Commission) to provide "[a]ll documents regarding jury selection, including but not limited to training documents, training agendas, manuals, policy statements or ... advisements, correspondence with current or former prosecutors and circuit court judges." Daise stated two capital lawyers who had reviewed some of the materials suggested they were a "handbook on how to get around *Batson*." Daise also noted the circuit court had received expert testimony from a statistician who indicated that in Beaufort County, African-American males were struck at a rate four and a half times higher than Caucasian males.[14]

The circuit court reviewed the Commission materials in camera and ruled they did not "include any abusive instructions or teaching materials, nor use of improper technique." The court also found the materials were "generally protected as work-product, as they were created and disseminated in a limited fashion with the purpose of assisting the State's preparations for trial." We agree. *See, e.g., Tobaccoville USA, Inc. v. McMaster*, 387 S.C. 287, 294, 692 S.E.2d 526, 530 (2010) ("[A]ttorney work product doctrine protects from discovery documents prepared in anticipation of litigation, unless a substantial need can be shown by the requesting party."); *State v. Myers*, 359 S.C. 40, 49, 596 S.E.2d 488, 493 (2004) (noting Rule 5, SCRCrimP, exempts from discovery work product and internal prosecution documents which contain no impeachment or exculpatory evidence); Rule 5(a)(2), SCRCrimP ("Except as provided in [prior subsections], this rule does not authorize the discovery or inspection of reports,

---

**13.** *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

**14.** This testimony does not appear in the record. However, the circuit judge noted she heard cases in Beaufort County every week and she had never been concerned with the racial makeup of the county's juries.

memoranda, or other internal prosecution documents made by the attorney for the prosecution or other prosecution agents in connection with the investigation or prosecution of the case. . . .").

■ Similarly, our review of the approximately 1000 pages of Commission materials sealed for appellate review revealed nothing encouraging prosecutors to strike jurors for impermissible reasons—race-based or otherwise. The documents include outlines, slideshows, and handouts from various lectures and training sessions.[15] Many discuss the *Batson* framework, and some do provide general advice on how to evaluate jurors. However, nothing in the submitted documents suggests an intent to help prosecutors racially discriminate. In fact, the materials contain statements such as "the critical question is whether or not a juror can give both the State and the defendant a fair trial" and the repeated caution: "DO NOT RELY ON STEREOTYPES & PREJUDICE."

> A trial court's rulings in matters relating to discovery generally will not be disturbed on appeal in the absence of a clear abuse of discretion. An abuse of discretion occurs when the trial court's order is controlled by an error of law or when there is no evidentiary support for the trial court's factual conclusions.

*Stokes-Craven Holding Corp. v. Robinson*, 416 S.C. 517, 537, 787 S.E.2d 485, 495 (2016) (citation omitted). We find no error in the circuit court's in camera review and quashing of the subpoena to the Commission.

## VI. Daise's Photograph

■ Daise argues the circuit court erred in admitting a photograph of him in a custodial pose (State's Exhibit 49) because it was unfairly prejudicial and implied he had a criminal record.

State's Exhibit 49 depicts Daise standing in profile in front of two bookshelves filled with books, framed pictures, and office supplies.[16] Daise is wearing a white tank top and blue

---

15. A large number of the materials are duplicative.

16. The State noted the photo was taken at a police substation that is actually "a house that they use after hours."

jeans. His hands are together near his beltline, and handcuffs or other restraint devices are not visible because the State digitally removed them.

The State asserted it sought to admit State's Exhibit 49 to show how Daise was dressed when he was apprehended. Daise stated he was willing to stipulate to the chain of custody for his jeans. The State responded there was no chain of custody issue and explained, "This is an issue of what he was wearing at the time law enforcement got there. That's the only photograph we have of him in the jeans." [17] Daise countered that even with the digital removal of the handcuffs, the photo depicted him in a custodial position and, thus, was substantially more prejudicial to him than probative to the State's case. In admitting the photo, the circuit court found the photo was not unfairly prejudicial and noted the State had an interest in trying its case and showing what Daise "came out in."

"For evidence to be admissible, it must be relevant." *State v. Sweat*, 362 S.C. 117, 126, 606 S.E.2d 508, 513 (Ct. App. 2004). " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Rule 401, SCRE. "Evidence is admissible if 'logically relevant' to establish a material fact or element of the crime; it need not be 'necessary' to the State's case in order to be admitted." *Sweat*, 362 S.C. at 127, 606 S.E.2d at 513. "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury . . . ." Rule 403, SCRE. "If judicial self-restraint is ever desirable, it is when a Rule 403 analysis of a trial court is reviewed by an appellate tribunal." *State v. Green*, 412 S.C. 65, 79, 770 S.E.2d 424, 432 (Ct. App. 2015) (quoting *State v. Lyles*, 379 S.C. 328, 339, 665 S.E.2d 201, 207 (Ct. App. 2008)).

We find the circuit court did not abuse its discretion in admitting the photograph.

---

**17.** Simmons's girlfriend testified State's Exhibit 49 reflected how Daise was dressed when police apprehended him at Simmons's home on the night of November 15.

The introduction of a 'mug-shot' of a defendant is reversible error unless: (1) the [S]tate has a demonstrable need to introduce the photograph, (2) the photograph shown to the jury does not suggest the defendant has a criminal record, and (3) the photograph is not introduced in such a way as to draw attention to its origin or implication.

*Id.* at 79, 770 S.E.2d at 432 (quoting *State v. Traylor*, 360 S.C. 74, 84, 600 S.E.2d 523, 528 (2004) (alteration in original)). In *State v. Stephens*, a defendant argued the admission of a photographic lineup was unduly prejudicial as it suggested he had a prior criminal history. 398 S.C. 314, 319–22, 728 S.E.2d 68, 71–73 (Ct. App. 2012). This court found the argument unpersuasive as the images in the lineup showed each subject wearing street clothes with their "head[s] and neck[s] against a blank background and [bearing] no identifying marks as to date, location, agency, or purpose of the photograph." *Id.* at 322, 728 S.E.2d at 72. State's Exhibit 49 was less suggestive than the photograph in *Stephens* because it showed Daise in street clothes, lacked identifying marks, *and* was not part of a lineup. The only parts of the photograph suggesting a custodial pose are Daise's profile view and the location of his hands in a position consistent with those of a person who is handcuffed from the front. However, neither of these elements suggest Daise had a prior criminal history. *See State v. Denson*, 269 S.C. 407, 413, 237 S.E.2d 761, 764 (1977) (holding the introduction of a photograph taken from a lineup did not imply the defendant had a criminal record; because there was testimony about the defendant's arrest, it was "much more likely the jury assumed the picture was taken by the police when the [defendant] was arrested").

## VII. Birthday Cake Photographs

■ Daise argues the trial court erred in admitting photographs showing a birthday cake because they were unnecessary and aroused the jury's sympathies and prejudices by reminding them that John Doe 1 died on his fourth birthday.

The record contains two photographs (State's Exhibits 5 and 6) depicting the birthday cake inside a white box on a couch in Jeanine's living room. Neither the cake nor the box contain discernible writing. The State argued the photographs were relevant to show there were no signs of a forced entry or

burglary in the living room. The circuit court agreed, finding the photographs were probative and not "prejudicial in any way."

State's Exhibits 5 and 6 are relevant because they show the undisturbed interior of Jeanine's home, supporting the unlikeliness of a home invasion by strangers. *See* Rule 401, SCRE (stating evidence is relevant if it tends to "make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence"). Specifically, Investigator Jody Hiers testified there were no signs that anything had been broken or stolen in the living room, and she used one of the photographs to note the presence of a stereo and TV. Investigator Hiers further described how other areas of the home showed no signs of a forced entry or burglary. *See State v. Elders*, 386 S.C. 474, 483, 688 S.E.2d 857, 862 (Ct. App. 2010) ("Ordinarily, it is not an abuse of discretion to admit photographs that corroborate testimony.").

As to the danger of unfair prejudice, we agree with the circuit court that State's Exhibits 5 and 6 merely showed the family was "going to a party" and were not offered to "elicit any sympathy." Notably, the cake was inside an unmarked box and no other hallmarks of a child's birthday party were visible except a possible birthday present beneath the box. We find such photographs were not "calculated to arouse the sympathy or prejudice of the jury," and, thus, were properly admitted. *State v. Brazell*, 325 S.C. 65, 78, 480 S.E.2d 64, 72 (1997).

## VIII. Cumulative Error

Daise argues the cumulative effect of the circuit court's errors warrants a new trial.

"The cumulative error doctrine provides relief to a party when a combination of errors, insignificant by themselves, has the effect of preventing the party from receiving a fair trial, and the cumulative effect of the errors affects the outcome of the trial." *State v. Beekman*, 405 S.C. 225, 237, 746 S.E.2d 483, 490 (Ct. App. 2013). "An appellant must demonstrate more than error in order to qualify for reversal pursuant to the cumulative error doctrine; rather, he must show the errors adversely affected his right to a fair trial to qualify for

reversal on this ground." *Id.* Given our analysis above, any errors by the circuit court were not prejudicial and did not combine to affect Daise's right to a fair trial. Simmons's own contradictory testimony mitigated any error caused by "pitting," and Porter's "fear" testimony was cumulative to other testimony admitted without objection. Thus, any error here is insufficient to warrant invocation of the cumulative error doctrine. *See id.* at 238, 746 S.E.2d at 490 (stating our courts do not apply the "plain error" rule and refusing to allow a defendant to argue that the cumulative effect of several unpreserved matters deprived him of a fair trial).

## Conclusion

Based on the foregoing analysis, Daise's convictions are

**AFFIRMED.**

GEATHERS and HILL, JJ., concur.